1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - X
                                    :
 3    JONATHAN BARAHONA and         :   21-CV-5400 (GRB)
      HECTOR HERNANDEZ,             :
 4                                  :
               Plaintiffs,          :
 5                                  :   United States Courthouse
                                    :   Central Islip, New York
 6         -against-                :
                                    :
 7                                  :   May 12, 2025
      PARADISE TREE                 :   9:30 a.m.
 8    SERVICE & LANDSCAPE CORP.      :
      and WILLIAM NIETO,            :
 9                                  :

10             Defendants.

11    - - - - - - - - - - - - - - - X

12           TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
                BEFORE THE HONORABLE GARY R. BROWN
13               UNITED STATES DISTRICT JUDGE

14               A P P E A R A N C E S:

15

      For the Plaintiff:  MOSER LAW FIRM P.C.
16                            5 East Main Street
                              Huntington, New York 11743
17                    BY:   STEVEN J. MOSER, ESQ.

18

19    Defendant Pro se:  WILLIAM NIETO
                            193 Lafayette Street
20                          Copiague, New York  11726

21    Interpreter:    Claudia Tomar - telephonically

22

23    Court Reporter:  Marie Foley, RMR, CRR
                        Official Court Reporter
                        Telephone: (631) 712-6104
24                      E-mail:  Marie_Foley@nyed.uscourts.gov

25    Proceedings recorded by computerized stenography.
      Transcript produced by Computer-aided Transcription.
```

*Proceedings*

2

1            (In open court.)

2            COURTROOM DEPUTY:  Calling case civil 2001-5400,

3    Barahona, et al. versus Paradise Tree Service and

4    Landscape Corporation, et al.

5            Counsel, please state your appearance for the

6    record.

7            MR. MOSER:  Steven Moser for the plaintiffs.

8    Good morning, your Honor.

9            THE COURT:  Good morning.

10            MR. NIETO:  Hi.

11            THE COURT:  State your name.

12            MR. NIETO:  My name is William Nieto.

13            THE COURT:  And you're representing yourself,

14    Mr. Nieto, right?

15            MR. NIETO:  Yes.

16            THE COURT:  And we discussed that in the past.

17    You haven't been able to get counsel, so you'll go ahead

18    and you'll represent yourself throughout this, yes?

19            MR. NIETO:  Yes.

20            THE COURT:  Someone is sitting with you at the

21    table.

22            Your name sir, again?

23            MR. K. NIETO:  My name is Kevin Nieto.

24            THE COURT:  And, Mr. Nieto, just to be clear,

25    you're not a party.  You're just there to help your dad

*Proceedings*

3

1    out, correct?

2              MR. K. NIETO:  Correct.

3              THE COURT:  Counsel, would you like to proceed

4    with on opening statement?

5              MR. MOSER:  I don't need to burden the Court

6    with an opening statement.  There's no jury here.

7              THE COURT:  I don't need to hear one, that's

8    great.  But I wanted to give you the opportunity.

9              Call your first witness.

10             MR. MOSER:  However, I do have one housekeeping

11   detail, that is my clients do need an interpreter.  We

12   have a certified federal interpreter on the phone.  I do

13   have the dial-in information.  I was going to do it on my

14   phone, but I think perhaps it would be better --

15             THE COURT:  It would be insane to do it on your

16   phone because we have to have it on our system.

17             MR. MOSER:  Okay.

18             THE COURT:  So, Karen, can you help out with

19   that?

20             MR. MOSER:  May I approach?

21             THE COURT:  Who are you going to call first?

22             MR. MOSER:  I was going to call the defendant

23   first.

24             THE COURT:  So let's set up the interpreter.

25             MR. MOSER:  I don't know if he needs an

*Proceedings*

4

1    interpreter.

2            THE COURT:  Mr. Nieto, do you need an

3    interpreter?

4            MR. NIETO:  No, he can help me.

5            THE COURT:  Okay.  So that's a little tricky.

6    So, we're going to have an interpreter on the phone.

7            Karen, give me one minute.

8            (Pause.)

9            THE COURT:  So, Mr. Nieto, we're going to have

10   an interpreter on the phone.  That interpreter could, if

11   you wanted, interpret his questions and interpret the

12   answers back and forth.  Or the interpreter can just be

13   there on standby so if you have a question, you can say "I

14   don't understand that" and we can just do those questions.

15           What's better for you?

16           MR. NIETO:  Just a standby.

17           THE COURT:  Okay.  Because I've had discussions

18   with you in the past --

19           MR. NIETO:  Yes.

20           THE COURT:  -- without an interpreter, and if I

21   may say so, your English skills are quite good, I think.

22           MR. NIETO:  All right.

23           THE COURT:  But there will be somebody there for

24   you, but if you needed it, don't hesitate.

25           MR. NIETO:  Okay, thank you.

*Proceedings*

5

```
 1              THE COURT:  So give us a minute, we'll get this
 2    set up.
 3              (Pause.)
 4              THE COURT:  While we are setting this up,
 5    counsel, your clients need the interpreter?
 6              MR. MOSER:  That was my other question for you,
 7    your Honor.
 8              THE COURT:  Yeah, because I was asking Mr. Nieto
 9    if he needs it if he wants just stand by, but you want
10    everything translated?
11              MR. MOSER:  No need everything translated.  If
12    you want to move forward, I'm okay with that.
13              THE COURT:  No, no.  It's your dime, as we used
14    to say in the days of pay telephones.
15              What do you want to do?  I don't care.  Do you
16    want to have the interpreter do everything?
17              MR. MOSER:  Not necessary.
18              THE COURT:  It will move faster without, but
19    your clients will sort of be --
20              MR. MOSER:  I spoke with my clients.  To the
21    extent they don't understand something that's going on,
22    they'll let me know.
23              THE COURT:  Okay.
24              Karen, do you have anybody on the line yet?
25              COURTROOM DEPUTY:  I'm trying to figure it out.
```

*Proceedings*

6

1           THE COURT:  Is there anybody on the call?

2           COURTROOM DEPUTY:  I'm not --

3           THE COURT:  Okay.

4           Is there a way that you can call in to my line?

5           MR. MOSER:  From whose line?

6           THE COURT:  Can they just call directly?

7           COURTROOM DEPUTY:  Can they just call us

8    directly?

9           THE COURT:  Instead of doing it by Zoom.

10          COURTROOM DEPUTY:  No, my audio is not working,

11   my audio conference isn't working, so I have to do it by

12   Zoom, but I can't call the number.

13          MR. MOSER:  I'll just have her call you, that's

14   fine.

15          COURTROOM DEPUTY:  Yeah.

16          (Pause.)

17          MR. MOSER:  Your Honor, I'm just going outside.

18   Excuse me, I apologize.

19          (Pause.)

20          MR. MOSER:  Your Honor.

21          THE COURT:  Yes, sir.

22          MR. MOSER:  If I may.

23          THE COURT:  Yes.

24          MR. MOSER:  The interpreter, I spoke with the

25   interpreter at 9:15 this morning to make sure that

*Proceedings*

7

1    everything was lined up and she was on the phone and now

2    she's not picking up.  I did send her the Court's contact

3    information.  I would like to proceed.

4              THE COURT:  But we can't, right?  Mr. Nieto

5    needs at least a standby interpreter, we've established,

6    and unless you want to consent to using his son in that

7    role, that's up to you.

8              MR. MOSER:  No, thank you, your Honor.

9              THE COURT:  Okay.

10             MR. MOSER:  I apologize.

11             THE COURT:  Then we'll have to wait, okay.

12             (Pause.)

13             THE COURT:  But I do have one of the nicest

14   staffs around.  So next time, just try to coordinate with

15   Karen ahead and come in and set it up before we get

16   started.  That's what I try to make available.

17             (Pause.)

18             THE COURT:  What's the word, Mr. Moser?

19             MR. MOSER:  The last passage "Trying"

20   interpreter.

21             THE COURT:  All right.

22             (Pause.)

23             MR. MOSER:  The next message "I am in" according

24   to the interpreter.

25             COURTROOM DEPUTY:  Okay.  She's in.

*Proceedings*

8

```
1              THE COURT:  Okay.  So does that mean we can hear
2    each other?
3              THE INTERPRETER:  Can you hear me?
4              THE COURT:  Yes, but you really have to speak
5    loud.
6              THE INTERPRETER:  Hello, can you hear me?
7              THE COURT:  Yes, that's okay.
8              Mr. Moser, let's get started.  Call your first
9    witness.
10             Wait, hang on.  I have an interpreter on the
11   phone.
12             (Interpreter sworn.)
13             THE INTERPRETER:  I do.
14             THE COURT:  And your name?
15             THE INTERPRETER:  My name is Claudia,
16   C-L-A-U-D-I-A, last name is Tomar, T-O-M-A-R.
17             THE COURT:  Okay, great.
18             You're calling Mr. Nieto?
19             MR. MOSER:  Yes, we call Mr. Nieto to the stand.
20             THE COURT:  Mr. Nieto, come on up to the witness
21   stand.  You're going to be sworn in and testify.
22             (Witness takes the witness stand.)
23             COURTROOM DEPUTY:  Please raise your right hand.
24
25
```

9

```
 1   WILLIAM NIETO,

 2        called by the Plaintiff, having been first duly

 3   sworn, was examined and testified as follows:

 4

 5             THE COURT:  Have a seat, sir.

 6             THE WITNESS:  Thank you.

 7             THE COURT:  All right.  The attorney for the

 8   plaintiffs is going to ask you some questions now.  You

 9   are under oath.  Keep yourself near the microphone so the

10   interpreter can hear you.

11             THE WITNESS:  Okay.

12             THE COURT:  Mr. Nieto, you may proceed.

13   DIRECT EXAMINATION

14   BY MR. MOSER:

15   Q.   Mr. Nieto, we have an interpreter online, a Spanish

16   interpreter.

17             Do you feel comfortable testifying in English

18   with her on standby in case you don't understand

19   something?

20   A.   I prefer in Spanish now.

21             THE COURT:  Okay, good.

22             Go ahead, please.

23   Q.   Where do you live, Mr. Nieto?

24   A.   193 Lafayette, and that is in New York.

25             (Pause.)
```

*W. Nieto - Direct/Moser*

10

1          THE COURT:  Yeah, we got Copiague.  Don't worry.

2          (Interpreter translates.)

3    A.    193 Lafayette Street, Copiague, New York 11726.

4    Q.    How long has that been your residence?

5    A.    It's been for over 30 -- well, 20 -- 20 -- over 20

6    years, 22.

7    Q.    Do you have a second home?

8    A.    No.

9    Q.    Have you ever had a second home?

10   A.    Yes.

11   Q.    And when did you have that second home?

12   A.    It's been about five -- no, about three years.

13   Q.    And where was that second home?

14   A.    That house was purchased in Pennsylvania.

15   Q.    Do you stay there today?

16         THE COURT:  Hold on.  Why do I care?

17         MR. MOSER:  Because --

18         THE COURT:  Hold on.  Let her translate that.

19         MR. MOSER:  You care because the witness needs

20   to be truthful with regard to something as simple as where

21   he's living.

22         THE COURT:  Okay.  You can proceed.

23   A.    I answered -- I answered the question.

24   Q.    You are the owner of a business known as Paradise

25   Tree Service and Landscaping Corp., correct?

W. Nieto - Direct/Moser

11

1    A.    (In English) Used to be.

2          THE WITNESS:  Oh, sorry.

3          (Interpreter translates.)

4    A.    That is correct, but the business no longer exists.

5    Q.    When was Paradise formed, approximately?

6          And when I say Paradise, you understand I'm

7    talking about Paradise Tree Service and Landscaping,

8    correct?

9    A.    Correct.

10   Q.    When did you form Paradise?

11   A.    It was in 2007, I believe.  In 2007.

12   Q.    And when was the business closed?

13   A.    October 7 of 2024.

14   Q.    Since closing Paradise, what have you been doing?

15   A.    At this moment, I've been working for another

16   company, but I've been working two or three days per week

17   doing landscaping or doing some type of estimate.

18   Q.    Do you operate any businesses today?

19   A.    No.

20   Q.    Do you own any businesses today?

21   A.    I'm trying -- I'm trying to see if -- to see if it

22   works-- if I can start a business in Pennsylvania, but I

23   still have not started it.

24   Q.    You had -- you opened up recently a business known as

25   Paradise Roofing; is that correct?

*W. Nieto - Direct/Moser*

1  A.    That is correct.

2  Q.    And you are the owner of that business?

3  A.    Yes.

4  Q.    And does that business have a website?

5  A.    Correct.

6  Q.    You opened up that business in the state of

7  Pennsylvania, correct?

8  A.    Correct.

9  Q.    You were licensed by the Pennsylvania Attorney

10  General to be a roofing contractor; isn't that true?

11  A.    Correct.

12  Q.    Isn't it true that Paradise Roofing has been

13  operating for eight years?

14  A.    No.

15  Q.    Do you live in Pennsylvania?

16  A.    I am -- well, I have a license in Pennsylvania, but I

17  both -- I live in both places because -- in the two states

18  because I have my children here.

19  Q.    So, before when you testified that your only

20  residence was on Long Island, was that truthful?

21        THE COURT:  All right.  No, we're not doing

22  that.

23        MR. MOSER:  All right.  Gotcha.  I'm going to

24  keep on going.

25

*W. Nieto - Direct/Moser*

13

1   BY MR. MOSER:

2   Q.   Do you recognize the two gentlemen seated to my left?

3   A.   Yes.

4   Q.   Who are they?

5   A.   Hector, Hector Hernandez and Jonathan Barahona.

6   Q.   How do you know them?

7   A.   That was around 2020 -- 2020 or 2019 when they

8   were -- they got there and they were asking for a job from

9   me.

10  Q.   Were they employed by Paradise?

11  A.   Well, Hector, he will come and work with me.

12  Whenever he didn't have a job, whenever, you know, he

13  didn't have a job with his boss he would come and work for

14  me perhaps one day a month or one day per week, and I'm

15  talking about Hector, Hector Hernandez.

16  Q.   When you say Hector worked, are you saying that he

17  worked for Paradise Tree Service and Landscaping Corp.?

18  A.   Well, not really.  He would come over perhaps because

19  he didn't want to be home.  So I would give him work -- I

20  would let him work for one day a week.

21  Q.   So just for clarification, was Hector Hernandez an

22  employee at any time of Paradise Tree Service and

23  Landscape Corp.?

24  A.   No.

25        MR. MOSER:  Your Honor, the pretrial order

*W. Nieto - Direct/Moser*

1   identifies four trial exhibits.  I have them in a folder.

2   I have a courtesy copy for the Court.  I actually have two

3   courtesy copies for the Court, if the Court would like to

4   see them.

5             THE COURT:  I only need one.

6             MR. MOSER:  May I present this to --

7             THE COURT:  Well, what document are we talking

8   about?

9             MR. MOSER:  We are talking about, for purposes

10   of this line of questioning, the deposition of the

11   defendant where he --

12             THE COURT:  You may show him any portion of the

13   defendant that you like.

14             MR. MOSER:  Okay.

15             (Pause.)

16             MR. MOSER:  May I present this to the witness?

17             (Pause.)

18   BY MR. MOSER:

19   Q.   Mr. Nieto, I'm showing you a transcript of a

20   deposition that was taken on February 7th of 2023.

21             Do you see that document?

22             THE WITNESS:  I need my glasses.

23             THE COURT:  Yeah, wait a minute.

24             (Pause.)

25             THE INTERPRETER:  Interpreter requests a

*W. Nieto - Direct/Moser*

15

 1  repetition of the answer.  I was not able to hear it.

 2          THE COURT:  Yeah, it's okay.  He just requested

 3  his glasses.  We got it.

 4          THE INTERPRETER:  Okay, thank you.

 5  BY MR. MOSER:

 6  Q.   Do you recall giving testimony on that date?

 7  A.   I recall it's been so many times and so many

 8  documents, but if the evidence is here, well, then that's

 9  true.

10  Q.   Was everything you said at that deposition the truth?

11          THE COURT:  No.

12          MR. MOSER:  I'll move on.

13          THE COURT:  Move on.

14  BY MR. MOSER:

15  Q.   I'm going to draw your attention to the page 25 of

16  your deposition, lines 9 through 16?

17  A.   Could you repeat that again, please?

18  Q.   This reference needs to be corrected here.

19          THE COURT:  Why don't you find us the right

20  place and direct us to the right place, please.

21          MR. MOSER:  I'm sorry?

22          THE COURT:  Find the right place and direct us

23  to the right place.

24          MR. MOSER:  Yes, your Honor.

25          (Pause.)

*W. Nieto - Direct/Moser*

16

1    BY MR. MOSER:

2    Q.   So, the page is page 22, lines 9 through 16.

3    A.   All of these pages are not organized.  They're not in

4    order.

5              THE COURT:  See if he can if you can find it,

6    sir.  If you can't, I'll ask him to help you.

7              THE WITNESS:  (In English) No, I can't find it.

8              (Pause.)

9              MR. MOSER:  For the record, your Honor, I

10   believe it is all in order.

11             THE COURT:  I don't care.  Just give him the

12   page.

13   BY MR. MOSER:

14   Q.   I'm going to read this to you.

15             QUESTION:  Is it fair to say that Hector

16   Hernandez was sometimes employed by Paradise in 2019 and

17   2020?

18             ANSWER:  He was my employee between 2019 and

19   2020, just five weeks.  That was it.  Nothing else.

20             QUESTION:  When you say "my employee," do you

21   mean employee of Paradise, correct?

22             And you answered:  Correct.

23             Was that truthful?

24   A.   I already stated that he would come to work with me

25   for at least once a week.

*W. Nieto - Direct/Moser*

17

1    Q.    And was Jonathan Barahona also an employee of

2    Paradise?

3    A.    Yes.

4    Q.    Did you hire Hector?

5          And when I say "Hector" for the purposes of this

6    bench trial I'm going to mean Hector Hernandez; is that

7    fair?

8    A.    I never hired Hector.  Jonathan would bring him, but

9    I never hired Hector.

10   Q.    Who hired Hector?

11   A.    Jonathan and Maldonado, another employee, would bring

12   Hector to work and I would always, would good intention,

13   pay for his day.

14   Q.    I'm going to draw your attention to page 15 of your

15   transcript.

16   A.    Can you give me the page?  'Cause I cannot find it.

17         (Pause.)

18   BY MR. MOSER:

19   Q.    I'm going to draw your attention to page 15, lines 9

20   through 12.  And it says here:

21         QUESTION:  Did you hire Jonathan Barahona?

22         ANSWER:   Yes.

23         QUESTION:  Did you hire Hector Hernandez?

24         ANSWER:   Yes.

25   A.    Yes, that is what I stated, and I repeated I do know

*W. Nieto - Direct/Moser*

1  him and he has worked for me some days, but he always

2  maintained another job during the other days of the week.

3  Q.   Were you the only owner of Paradise?

4  A.   Yes.

5  Q.   Were you primarily responsible for supervising

6  Jonathan and Hector?

7  A.   Yes.

8  Q.   Did you have the authority to hire and fire employees

9  of Paradise?

10 A.   Yes.

11 Q.   Did anyone else besides you have the authority to

12 hire or fire employees of Paradise?

13 A.   No.

14 Q.   You were responsible for paying employees of

15 Paradise?

16 A.   Yes.

17 Q.   And that included Jonathan Barahona?

18 A.   Yes.

19 Q.   And that included Hector Hernandez?

20 A.   I used to pay for his workday, like I said, one day

21 of work.

22 Q.   My question is simple.

23       Did you pay Hector Hernandez?

24 A.   Yes, I was always paying for his day of work at the

25 of the day.

*W. Nieto - Direct/Moser*

19

1    Q.   When you hired Jonathan, did you complete any

2    paperwork?

3    A.   That was my intention.  That was my intention.  My

4    intention was to pay him with a check, but Jonathan told

5    me, he asked me as a favor to please pay him in cash

6    because he didn't have any kind of document, no ID, in

7    order to cash the check and so he wouldn't accept my check

8    as payment.

9    Q.   Did you complete any paperwork when you hired

10   Jonathan Barahona?

11   A.   No, that was never completed because when he came

12   looking for a job, he was still working for other

13   construction companies and he would come to work with me

14   one, two, three days.

15   Q.   When you hired Jonathan, you didn't complete any I-9

16   or any other paperwork, correct?

17   A.   No, because they never agreed to get paid by check.

18              (Continued on following page.)

19

20

21

22

23

24

25

Nieto - Direct/Moser

20

1    (Continued.)

2    Q.    And when you hired Hector, did you provide him with

3    any documents or paperwork?

4    A.    No, because like I said, he would only work once a

5    week, and sometimes he would work twice a week.  So that

6    was never completed.  And again, Hector doesn't have any

7    kind of document in order to cash a check.  At least

8    that's what he told me.

9    Q.    How come you didn't just write a company check and

10   cash it for him and give him the cash?

11          THE COURT:  Objection, sustained.

12   BY MR. MOSER:

13   Q.    Do you have any records of the date on which you

14   hired either Jonathan or Hector?

15   A.    I believe that it was in 2017 or -- well, 2017 or

16   2018.  I don't quite remember at this moment, but that's

17   what I recall.  That's when I think he came to work with

18   me.

19   Q.    Is it fair to say that you have no records whatsoever

20   regarding when Jonathan was hired?

21   A.    No.  Not exactly.

22   Q.    What records do you have?

23   A.    I don't recall having any kind of record because

24   there was no reason to have a record, to obtain a record,

25   because he would only come to work once in a while, and

Nieto - Direct/Moser

21

 1    they always expected to be paid in cash.

 2            MR. MOSER:  Let's just abbreviate this because I

 3    think it's going to take too long.

 4            Your Honor, may I present to the witness --

 5            THE COURT:  You don't have to ask.  Go ahead.

 6            MR. MOSER:  May I present to the witness --

 7            THE COURT:  You don't have to ask me.  Just tell

 8    me what it is.

 9            MR. MOSER:  It's the affidavit dated -- with the

10    document number 16 docket entry 16 it was filed on

11    July 17, 2022.

12            THE COURT:  Okay.  Go ahead.  Show him.

13    BY MR. MOSER:

14    Q.   Was everything that you said in that -- I'm sorry.

15    Have you had a chance to --

16            THE COURT:  Hold on, give him a chance to read

17    it.

18            Mr. Nieto, read it then I have a question.  Mr.

19    Nieto, look up when you're done.  Are you done?

20            MR. NIETO:  Continue.

21            THE COURT:  Are you ready?

22            MR. NIETO:  Yes, I'm ready.

23            THE COURT:  For my purposes, I just want to ask.

24            In this affidavit it says that you don't have

25    time sheets or payroll records for the plaintiff's.  You

22

1    searched for them, you looked for records at 193 Lafayette

2    Street.  You searched various practices and policies about

3    wages and records.  And you don't have anything.  Is that

4    all right?

5              MR. NIETO:  That's correct.

6              THE COURT:  That's correct?

7              MR. NIETO:  That's correct.

8              THE COURT:  Got it, never mind.  Thank you.  You

9    can continue.  But please don't repeat everything I just

10   did.  I tried to save us some time here.

11             MR. MOSER:  I understand.  Thank you for

12   abbreviating the process.

13             THE COURT:  Go ahead.

14   BY MR. MOSER:

15   Q.   So were you truthful in this affidavit?

16             THE COURT:  Wait, he just said it's all correct.

17   Go ahead, move on, we have this all established.

18   Everything in here is established.  Go on.

19   Q.   So besides your testimony, is there anything else

20   that you have which could refute Mr. Barahona's testimony

21   about the hours that he worked, the days that he worked,

22   the weeks that he worked?

23   A.   Yes.  I always paid him, I always paid him for his

24   workday.  I always pay him, and any time he would work he

25   would only work an hour or two that he was working over

Nieto - Direct/Moser

23

1   time, I would also pay for that.  And I have my son as my

2   witness because he worked during the summer when he was

3   not in school.

4   Q.    Besides -- do you have anything to refute, besides

5   your own testimony, Hector Hernandez's testimony regarding

6   the hours that he worked for you, the wages that he was

7   paid, and the dates that he was employed?

8   A.    Same thing.  If Hector was to come work for me for

9   one day, or, if for any chance he would work two days, I

10  would always pay him in cash.  And if he was going to work

11  an extra hour, I would always pay him.  And he was a man

12  that the payment was made in cash, always.  In addition to

13  that, Maldonado also worked for me and he never complained

14  about anything because he knew -- he never complained

15  about the money because he knew they were always paid on

16  time and were paid for extra hours.  Unfortunately, at

17  this moment, Maldonado is working.  Oh, he is in prison.

18  And he is not able to corroborate what I'm saying.

19  Q.    If Jonathan worked after 4 o'clock p.m., would you

20  pay him money?

21  A.    Always.  I would always pay him --

22  Q.    How much extra would you --

23  A.    I would always pay him extra money.

24  Q.    How much extra money would you pay him if he worked

25  after four?

Nieto - Direct/Moser

24

1    A.    He would work and I would pay him 150 per day.  But

2    if he worked more, then sometimes I would pay him 170,

3    180.  Up to 200 a day.

4    Q.    Did you ever pay him more than $200 a day?

5    A.    Yes.  If at any given moment we had a good workday,

6    then I would give him a little bit more.  I would give him

7    220, and I would also pay for their food.  They never paid

8    for any food, I always gave them the food.

9    Q.    So what is the most that you ever paid Jonathan for a

10   workday?

11   A.    I believe that it was 200 to 220.  The normal amount

12   that is paid.

13   Q.    What is the most that you ever paid Hector for a

14   workday?

15   A.    175 and, at times, also, $200.

16   Q.    If Hector worked after 4 o'clock p.m., would you pay

17   him extra?

18   A.    Yes.

19   Q.    How much extra?

20   A.    It would be another extra $20, a lot of times 25.

21   And they were always happy with their pay.  They never

22   complained about it.

23             MR. MOSER:  Your Honor, may I approach the

24   witness?

25             THE COURT:  Yes.

25

1        MR. MOSER:  I'm looking at ECF Document 14.

2        THE COURT:  Okay, affidavit.  Read it, I'm going

3   to have the same question for you.  Is this right, what's

4   in this, is it correct?

5        THE WITNESS:  Okay.

6        THE COURT:  Is it right?

7        THE WITNESS:  Right.

8        THE COURT:  Take it from there, please.

9   BY MR. MOSER:

10  Q.   Why did -- is Hector Hernandez still working for

11  Paradise?

12  A.   No.  What do you mean?  The company no longer exists.

13  Q.   And why did you stop working for Paradise?

14  A.   He just left because he said he had a job somewhere

15  else, but Hector was never fired or anything else like

16  that.

17  Q.   And why did -- why did Jonathan stop working for

18  Paradise?

19  A.   Well, Jonathan, I never fired him, but he was the

20  kind of person that would use drugs during work hours.

21  And, you know, I felt like I couldn't control him.  So

22  perhaps he was the guy that, you know, we had a lot of

23  arguments, I always tried to work with him.  And on the

24  last day that he stopped working, like, in 2021, that is

25  when he just left and left the job.

**Nieto - Direct/Moser**

1  Q.  Did Jonathan drive a truck for you?

2  A.  At the end, yes, he did start driving a truck.

3  Q.  Was it a large truck?

4  A.  I would say medium.

5  Q.  Was it a bucket truck?

6  A.  Yes.

7  Q.  Does the driver of that truck have to have a CDL by

8  law?

9  A.  I believe so.

10  Q.  Did Jonathan have a CDL?

11  A.  No.  He said that he wanted to drive that truck so

12  that he could get better pay.

13  Q.  So at some point you became concerned about

14  Jonathan's drug use according to you.

15  A.  I would say that he had stopped using it, but many

16  times on many occasions, I found drugs inside the truck.

17  Q.  Did you ever see him smoking marijuana while at work?

18       THE COURT:  Wait, wait, wait.  Stop.  This is so

19  far afield.  Can we move along, Mr. Moser?

20       MR. MOSER:  I will move on.

21  BY MR. MOSER:

22  Q.  So regardless of the fact that you -- he did not have

23  a commercial driver's license and regardless of the fact

24  that you claim he was a persistent drug user, you let him

25  drive one of your vehicles?

Nieto - Direct/Moser

27

1    THE COURT:  Mr. Moser, why do I care?  Mr.

2    Moser, there's no attorney here defending this man.  This

3    is very hard, keep it focused.

4    MR. MOSER:  Thank you, your Honor.  I have no

5    further questions for this witness.

6    THE COURT:  Okay.  Stay there for one moment,

7    sir.

8    Normally, if you had an attorney, the attorney

9    would ask you questions if you wanted to say or add

10   anything to the record.  You don't have an attorney here,

11   so I will let you add things to your testimony.  This

12   isn't an argument, but if there are other facts that you

13   think you should add, I'll hear them from you.  But know

14   that Mr. Moser can cross-examine you more.  So if there is

15   anything you would like to say.  This is your chance.

16   THE WITNESS:  I would like to say something in

17   Spanish, right?

18   THE COURT:  Please.  Do it in pieces so she can

19   translate that.

20   THE WITNESS:  On one occasion -- well, Hector

21   and Barahona, we were friend's, let's say that.  Once

22   Hector told me that he had once killed a person in El

23   Salvador used a nine-millimeter, I started looking at him

24   in a different way.  And Jonathan told me on that same day

25   that he had killed a person with a gun because his friends

1   had tied him up to a tree.  And he told me face to face,

2   he told me that how he had killed that man by throwing

3   stones on his face up to the point where he stopped

4   breathing and died.  After that, I stopped asking him,

5   inviting him to come over to my house for gatherings

6   because, at that time, I started to see him as dangerous

7   and criminal people.  And I even spoke to Maldonado a

8   couple of weeks ago, who is currently in prison.  And he

9   told me that Hector had sent somebody to El Salvador so he

10  could have someone killed.

11          THE COURT:  Okay.  I'm going to stop you there.

12  This is not that helpful here.  What I need you to tell me

13  is anything about the payments, right?  That's really what

14  we're focusing on here.  Did you pay salary correctly.  I

15  stopped asking Mr. Moser about drugs and driving, using

16  drugs, I don't care.  Killing people, terrible thing, but

17  it doesn't matter for today.  For today, we need things.

18  For example, in your affidavit -- I'll let the translator

19  translate.

20          Now, what would be helpful is if you have any

21  more information about this.  In your affidavit about

22  Jonathan, you say you have no records, but you tell me how

23  much you paid him.  You say 2017 to 2018, yes, roughly,

24  you paid him $150 a day.  And then 2018 to 2019, it was up

25  to $200 per day.  And so forth.  How, without records, can

29

1    you remember that, sir?

2            THE WITNESS:  Like I said before, at the

3    beginning he was getting paid 150, but by the end, he was

4    making $200.

5            THE COURT:  Okay.  But then you say he went on

6    to make $300 per workday, yes?

7            THE WITNESS:  Well, I don't remember that.

8    Perhaps on one occasion or some occasions but his ending

9    pay was 200.

10           THE COURT:  Okay.  And then you said you paid

11   overtime at the rate of $30 per half hour.  And then $50

12   per hour worked after 6:00 p.m.  Was that the whole time?

13           THE WITNESS:  That would sometimes happen, but

14   it was very rare.

15           THE COURT:  Okay.  But I'm saying the numbers

16   were the same, the 30 and the 50, $30 a half hour, $50 an

17   hour.  That was the same for the whole time he worked for

18   you?

19           THE WITNESS:  No, no.  That would only take

20   place at the end when he was working.  But as I mentioned

21   before at the beginning, it was 150.

22           THE COURT:  Do you have any other follow up?

23   BY MR. MOSER:

24   Q.   The daily pay that you paid to Hector, was it

25   intended to compensate him for only eight hours?

1       THE COURT:  Wait, wait, wait, we're talking

2  about Hector now.

3       MR. MOSER:  Yes.

4       THE COURT:  Okay, go ahead.

5  A.    Correct.

6  Q.    And the daily rate that you paid to Jonathan, it was

7  intended to compensate him only for eight hours?

8  A.    Sometimes there were times that he would only work

9  eight hours.  Sometimes we would only work half a day.

10  But whenever he would work late, I would always pay him

11  his overtime.

12  Q.    My question is:  If you paid him his daily rate,

13  which you said at one point in time was 150, later it was

14  200, was that for eight hours of work?

15  A.    Correct.

16  Q.    Do you recall that at your deposition, you testified

17  that you didn't pay them these overtime rates after

18  6 o'clock p.m., you paid them these overtime rates after

19  4 o'clock p.m.?

20  A.    Whenever we're talking about six in the afternoon,

21  that was because there was some type of work that needed

22  to be done urgently.  But that was very rare.

23  Q.    My question is:  Did you testify at your deposition

24  that you would pay them these overtime rates after

25  4 o'clock p.m.?

Barahona - Direct/Moser

31

1          THE COURT:  I picked that up.  I'll take that as

2   established.  Go ahead.

3          MR. MOSER:  I have no further questions for the

4   witness.

5          THE COURT:  Okay.  Sir, you can step down, yes.

6   Thank you.

7          (Witness leaves the witness stand.)

8          Who is you're next witness?

9          MR. MOSER:  I'm going to call Jonathan Barahona.

10   We have a request for a bathroom break.

11          THE COURT:  Okay, let's do that.  Ten minutes to

12   use the bathrooms.

13          MR. MOSER:  Thank you, your Honor.

14          (A recess was taken at this time.)

15          THE COURT:  All right.  Is the interpreter on

16   the line?

17          THE INTERPRETER:  I'm here.

18          THE COURT:  Excellent.  Yes.

19          Call your next witness, please.

20          MR. MOSER:  Yes.  I call Jonathan Barahona.

21          **JONATHAN BARAHONA,**

22          called as a witness having been first duly

23   sworn, was examined and testified as follows:

24          THE COURTROOM DEPUTY:  Please, state and spell

25   your name for the record.

Barahona - Direct/Moser

32

1          THE WITNESS:  Yes.

2          THE COURT:  You can sit.  Thank you.  Please

3    proceed with your questions.

4    DIRECT EXAMINATION

5    BY MR. MOSER:

6    Q.    Good afternoon.

7    A.    Good afternoon.

8    Q.    Do you recognize Mr. Nieto as your former employer?

9    A.    Yes.

10   Q.    When you worked for Mr. Nieto, what company did you

11   work for?

12   A.    Paradise Tree Service.

13   Q.    What was the business of Paradise Tree Service?

14   A.    Trimming trees.

15   Q.    Did you do any work other than tree cutting when you

16   worked for Paradise?

17   A.    The company was only in the business of cutting

18   trees.  That's all.

19   Q.    What did you do when you worked for Paradise?

20   A.    I was kind of like the right hand, you know, the

21   first person to help the supervise and the manager.  The

22   one who was in charge of everything who was Jorge

23   Maldonado.

24   Q.    During what period of time did you work Paradise?

25   A.    That was during the middle of 2017, like, March, and

Barahona - Direct/Moser

1   like the 15 through the 20.  Until 2021 in June when we

2   had the argument and then I was fired.

3   Q.    And when you worked for Paradise, was there a busy

4   season?

5   A.    When I was working for Paradise, it was during the

6   busy season that's when I first started in March until the

7   middle of November.  During that season, you know, that's

8   the busiest because by December, mid December, you don't

9   work.  And then after that, it's normal.  It's not that

10  much work in this country.

11  Q.    During the busy season, how many hours did you work

12  for Paradise?

13  A.    I was supposed to work eight hours, but I would

14  usually work 12 hours.  From seven in the morning until

15  7:30 at night.

16  Q.    Did you ever complain to Mr. Nieto about working the

17  longer days?

18  A.    Pretty much all of the time.  The reason for that was

19  because we were working -- pretty much all of the time we

20  were working extra time, and we were not getting paid for

21  over time.

22  Q.    What was your pay throughout your employment with

23  Paradise?

24  A.    Can you please repeat the question.

25  Q.    When you first started working for Paradise, how much

**Barahona - Direct/Moser**

34

1    were you paid?

2    A.    150 per day.

3    Q.    And did that ever change?

4    A.    To be honest with you, it didn't.

5            THE COURT:  To you honest with you, it didn't,

6    he said.

7    Q.    When you -- at some point, did you become a driver?

8    A.    Yes.  After some time, I bought another truck and I

9    didn't have a driver.  So it was me that had to drive.

10   Q.    Did you receive any additional money on the days that

11   you drove?

12   A.    Well, later he did give me something extra, just for

13   driving, but I don't recall how much it was.  The problem

14   was it was not the amount that he was supposed to.

15   Q.    Were you paid in cash?

16   A.    Yes.  He always paid me in cash.

17   Q.    When you were paid, did you ever receive a statement

18   that showed the hours that you worked and how your wages

19   were computed?

20   A.    No, we never had anything that was in writing or

21   anything like that.  It was just like that.

22   Q.    When you were hired, did you receive any notice or

23   any other documents from Paradise?

24   A.    None.

25   Q.    Did you ever receive overtime pay?

Barahona - Direct/Moser

35

 1    A.   Well, that was the problem.  They never paid for it.

 2              MR. MOSER:  I have no further questions for this

 3    witness.

 4              THE COURT:  Wait.  Stop for a second.  How long

 5    did you work for him in total?  How many months or years?

 6              THE WITNESS:  It was for years.  From 2017 until

 7    2021.

 8              THE COURT:  Okay.

 9              Now, when you worked for him between 2017, 2021,

10    did you work all year, part of the year, some of the year?

11              THE WITNESS:  From March until November, it was

12    every single day.  5 to 6 days.  And then by December and

13    January, and February, it was like 2 or 3 days because by

14    then, the season slowed.

15              THE COURT:  You were trimming trees in December

16    and January?

17              THE WITNESS:  We even cut the trees in the snow.

18              THE COURT:  Okay.  All right.  So were there

19    months at all that you didn't work?

20              THE WITNESS:  Well, I mean we always worked but

21    like I said, in January or February, those are the months

22    when let's say you worked one or 2 days per week.  And the

23    work is pretty slow but I mean, you always have the trees

24    12 months out of the year.

25              THE COURT:  Okay and in the rest of the year,

Barahona - Cross/Nieto

36

1   you were working five days a week?

2              THE WITNESS:  Yes.  Usually we would work six

3   days, but usually like five you know, five days for the

4   rest of the week.

5              THE COURT:  Okay.  Sir, would you --

6              Mr. Nieto, would you like to ask him any

7   questions?  Counsel, you can step away from the podium,

8   please.  And let's try to keep it to the hours and the pay

9   and so forth, yes?

10             MR. NIETO:  Okay.

11             THE COURT:  And Mr. Nieto, you can feel free to

12  ask the questions in Spanish, the interpreter will

13  interpret for me and the reporter.  You just have to let

14  her do that.  Do you understand?

15             MR. NIETO:  Yes.

16  CROSS-EXAMINATION

17  BY MR. NIETO:

18  Q.   Jonathan, you know that I always paid whenever you

19  worked late hours.  I never stopped paying you especially

20  you.  And I even paid you, you know that I even paid you

21  money when ever you would ask for it.  You would ask me

22  for money because you didn't have money for rent so I

23  would give you some money.  And you owed me about $600,

24  how are you going to pay for that.  You know that I always

25  pay for everything and what you have is to manipulate

Barahona - Cross/Nieto

1  because you know that you have five thousand dollars from

2  company service and, you know, you always tried to get

3  money when you see the opportunity.

4      THE COURT:  That's a lot of questions.

5  Translate for me, please.  That's a lot of questions.  I'm

6  going to break it down a little bit.

7      Is it true that he sometimes paid you more than

8  the daily rate when you worked late?

9      THE WITNESS:  Never.  What he's saying is that

10  he complied by paying, and he did, he did pay and it was

11  during the normal schedule, but what we're complaining

12  about is the extra hours that is the reason why the job

13  ended for me and for the rest of the people.

14      THE COURT:  Okay.  Mr. Nieto just asked you

15  though that if you worked past a certain time at night, he

16  would give you extra money.  Is that true?

17      THE WITNESS:  He never did that?

18      THE COURT:  Never.

19      THE WITNESS:  Never.

20      THE COURT:  Okay.  Is it true that he gave you

21  extra money to help with rent or anything like that?

22      THE INTERPRETER:  Interpreter needs a

23  clarification of the answer.

24      THE WITNESS:  He did not lend me the money.  I

25  actually have to give him a television, so I can get the

**Barahona - Cross/Nieto**

38

1   money.  And I'm not is matched of saying I needed the

2   money for the rent and I believe he still has that TV set.

3             THE COURT:  Okay.  What else would you like to

4   ask?

5             MR. NIETO:  I'm just going to reiterate that

6   what he's saying is he's lying.  He's lying about

7   Hernandez as well and he's lying before God because God

8   knows very well that I always pay him for his extra

9   overtime.

10            THE COURT:  We're not going to argue.  You can

11  ask him questions.  If you're done, tell me.

12            MR. NIETO:  No for questions.

13            THE COURT:  Okay.  Any follow?  Up.

14            MR. MOSER:  None.

15            THE COURT:  Okay sir, you can step down.  Thank

16  you.

17            (Witness leaves the witness stand.)

18            THE COURT:  All right, I have a criminal matter

19  on I need to take a quick break.  So I'll ask everyone to

20  just step into the gallery and then we will come back.

21            (A recess was taken at this time.)

22            (Continued on the next page.)

23

24

25

Hernandez - Direct - Moser

1    (Continued.)

2              THE COURT:  Who is your next witness?

3              MR. MOSER:  Plaintiff calls Hector Hernandez.

4              **HECTOR HERNANDEZ,**

5    called as a witness having been first duly sworn, was

6    examined and testified as follows:

7              THE COURT:  Have a seat.  You may proceed with

8    your questions.

9    DIRECT EXAMINATION

10   BY MR. MOSER:

11   Q.    Good afternoon, Hector.  Were you employed by

12   Paradise Tree Service and Landscaping Corporation?

13   A.    Yes.

14   Q.    What did you do for them?

15   A.    Well, we were working by trimming the trees and

16   cleaning up.

17   Q.    What specifically did you do in the company?

18   A.    Well, I would pick up all of the branchs and all of

19   that.  Cleaning up.

20   Q.    When did you start working for Paradise?

21   A.    Well, I started for some days in 2018 and then I

22   remained there until 2019 to 2020.  Two years that I

23   worked with him.

24   Q.    Did you work all year round or did you have some

25   months that you were off?

Hernandez - Direct - Moser

40

1    A.    Yes.  From March until November, you worked five or

2    6 days.  And then after that, the work is kind of slow

3    because of the cold.  Then you always work you know, like

4    2 or 3 days a week for those months.

5    Q.    You even cut trees in the winter?

6    A.    Yes.  Always.

7    Q.    And what time were you supposed to report to work?

8    A.    We would always get there right at 7 o'clock.  And

9    sometimes at 645.

10    Q.    Okay.  And were you paid a certain amount per day?

11    A.    150.

12    Q.    Was that 150 supposed to pay for more than eight

13    hours?

14    A.    At times we would work until 7 or 8.  All of the

15    time.

16            THE COURT:  Wait a minute.  You said at times or

17    all of the time?

18            THE WITNESS:  No, no.  Sometimes.

19            THE COURT:  How often?

20            THE WITNESS:  It was always like three times a

21    week or two times a week.

22            THE COURT:  That you would work until what time?

23            THE WITNESS:  On a day, we would always work

24    until six.  Always until six.

25            THE COURT:  Okay.  And then occasionally, you

Hernandez - Direct - Moser

41

1    were working until 7 or 8, yes?

2         THE WITNESS:  Yes, sometimes it would be three

3    times or two times a week.

4    BY MR. MOSER:

5    Q.   When did you stop working for Paradise?

6    A.   It was 2020.  Well, it was already 2021.

7    Q.   Approximately two years?

8    A.   Yes.  Two years.

9         THE COURT:  When did you stop, what month did

10   you stop working in 2021?

11        THE WITNESS:  It was in November.  Well, it was

12   in 2020 about to become 2021 in November.

13        THE COURT:  So you worked from what month in

14   2019, when did you start?

15        THE WITNESS:  Well, I started working with him

16   in 2018.  I was only there to work one day like I said.

17   Then later I remained working for him for two years.

18        THE COURT:  Let's start again.  Beginning in

19   2018, you worked for him one day a week?

20        THE WITNESS:  Yes.  I started out working one

21   day, but then later, I stayed there working every single

22   day.

23        THE COURT:  I got it.  I just need to know when

24   everything happened.  So you can translate that.

25        What month in 2018 did you begin working one day

Hernandez - Direct - Moser

42

1    a week?

2              THE WITNESS:  When I started it was during the

3    first month of the year.

4              THE COURT:  Okay.  And then in the spring maybe?

5              THE WITNESS:  Yes.

6              THE COURT:  So let's put that down as March.  So

7    you started working one day a week and then in 2019, you

8    started working full-time.  What month in 2019 did you

9    begin working full-time?

10             THE WITNESS:  Yes.

11             THE COURT:  What month?  What month?

12             THE WITNESS:  In March.

13             THE COURT:  Okay.  You can continue, sir.

14   BY MR. MOSER:

15   Q.   I have a question.

16             Why did you keep on working?

17             MR. MOSER:  I'll withdraw that.

18   Q.   So if you worked past 4 o'clock p.m., would you get

19   any extra pay?

20   A.   Never.  That was the problem.

21   Q.   Why keep working?

22   A.   Because of the need that we had.

23   Q.   Can you explain what you mean by the need?

24   A.   Well, because we need to work when we're here in

25   order to pay for rent and all of that.

Hernandez - Direct - Moser

43

1    Q.   Was $150 the going rate for a landscaping helper

2    during the time that you worked for Paradise?

3           THE COURT:  I don't know what that means just

4    ask a question he can answer.  What does that mean?

5    You're interested in minimum wage overtime rates, who

6    cares.

7           MR. MOSER:  Just explains --

8           THE COURT:  Move on, this is hard enough,

9    please.

10   BY MR. MOSER:

11   Q.   At what point did you stop working for Paradise?

12   What month and year?

13   A.   In November of 2020.

14          MR. MOSER:  I have no further questions.

15          THE COURT:  Okay.

16          Mr. Nieto, you're free to ask questions if you

17   would like.

18          MR. MOSER:  I apologize, your Honor.

19          THE COURT:  Give me one second.  Finish.

20   Q.   Were you provided any documents at the time you were

21   hired by Paradise?

22   A.   No.

23   Q.   Were you ever given a statement with the pay that you

24   received?

25   A.   What do you mean?

## Hernandez - Cross - Nieto

44

1   Q.   Did you ever receive any statement with your payment

2   of wages explaining how it was -- how your wages were

3   computed?

4   A.   No, never.

5            MR. MOSER:  No further questions.

6            THE COURT:  Okay.

7            Again, sir, you can take the microphone and ask

8   questions.

9   CROSS EXAMINATION

10  BY MR. NIETO:

11  Q.   Hector, if I had offered you as I told you that I was

12  going to pay you with a check because, remember, you

13  didn't want me to pay you with a check because you didn't

14  have any documents to cash the check, remember?

15  A.   No, we never spoke about that, about my paperwork.

16           THE COURT:  Any more questions?

17  Q.   You know that you're lying because I always paid you

18  for everything.  Whenever you worked overtime, I always

19  paid for that and look me in the eyes because I'm telling

20  you the truth.

21           All I know is that the two of you are looking

22  for easy money.

23           MR. NIETO:  That's it, no more questions.

24           THE COURT:  That wasn't a question but hold on,

25  I've got a question.

**Hernandez - Cross - Nieto**

45

1    Did he ever pay you more money if you worked a

2   longer day?

3    THE WITNESS:  Never.  Never.

4    THE COURT:  Anything else?

5    MR. NIETO:  No.

6    MR. MOSER:  Nothing further, your Honor.

7    THE COURT:  You can step down.

8    (Witness leaves the witness stand.)

9    THE COURT:  Call your next witness.

10    MR. MOSER:  No further questions.

11    THE COURT:  Sir, you're free to call a witness.

12   Do you want to call somebody, do you want to call your son

13   to the stand?  You don't have to, I thought you said you

14   were going to.

15    MR. NIETO:  No.

16    THE COURT:  Okay.  Any other witness?  Anything

17   else you have to give me?

18    MR. NIETO:  He knows that he worked with me

19   during the time that he was not going to school.

20    THE COURT:  Okay.  You can call him if you want.

21   I don't know if he knows anything about how the pay

22   worked.

23    MR. MOSER:  Objection.

24    THE COURT:  There's no objection.  He didn't

25   call the witness.  I'm asking him if he wants to call the

K. Nieto - Direct- Nieto

46

1    witness.  Hang on.

2              MR. NIETO:  He's my witness.  Because he knows

3    -- I paid him.

4              THE COURT:  It only helps me if he gets it up

5    here and says it under oath.  And if he lies, it's a big

6    problem.

7              Come on up, sir, and you can be sworn in.

8              **KEVIN NIETO**,

9    called as a witness having been first duly sworn, was

10   examined and testified as follows:

11             THE COURTROOM DEPUTY:  Please, state and spell

12   your name for the record.

13             THE COURT:  Is your preferred language English?

14   You have to ask him questions, okay.  You can do that in

15   English or Spanish.  If you do it in Spanish, she will

16   interpret it for me and for you.  And we'll all try to

17   follow along.

18             MR. MOSER:  Your Honor, just for the record, I

19   state my objection to this witness.  He was never

20   identified in a Rule 26 disclosure.  Never identified in

21   the course of discovery, never identified by former

22   counsel as a potential witness.  Never identified by me as

23   a potential witness until today.

24             THE COURT:  That's interesting.  Well, I'm going

25   to allow him to testify, see what it amounts to.

K. Nieto - Direct- Nieto

47

1          THE COURTROOM DEPUTY:  Can we just get the

2    witness's name?

3          THE COURT:  Say your name and spell your name.

4          THE WITNESS:  K-E-V-I-N.  Last name, N-I-E-T-O.

5          THE COURT:  All right.

6          Mr. Nieto, you can ask him questions.

7    DIRECT EXAMINATION

8    BY MR. NIETO:

9    Q.   Do you remember, Kevin, in the summer and you was in

10   the high school off of school you used to work for me?

11   A.   Yes.

12   Q.   Do you remember when I paid them these two person in

13   front of yourself in cash and paid them sometimes extra

14   when they worked late, let's say, 1 or 2 hours late.  Do

15   you remember that?

16   A.   Yes.  I do.  After you would be done paying me, you

17   could pay the workers what they were paid.  If the

18   customer decided to leave a tip, because they were in a

19   good mood, the tips would be spread out so it would be

20   over 150.

21          (Continued on the next page.)

22

23

24

25

*K. Nieto - Direct/Nieto*

48

1    (Continued)

2    BY MR. NIETO:

3    Q.   Okay.  But do you remember when -- when we -- when I

4    paid them, do you remember that I pay in front of yourself

5    cash, I know?

6    A.   Yes.  Sometimes they would come to the house to pick

7    up the cash as well.

8         MR. NIETO:  Okay.  This is the only question,

9    only two questions that I have for him.

10        THE COURT:  Okay.

11        Do you have any questions?

12   CROSS-EXAMINATION

13   BY MR. MOSER:

14   Q.   Mr. Nieto, did you have any conversations with your

15   father about what you would say here today?

16   A.   I'm just speaking what I've seen.  I'm just speaking

17   what I've seen from the past.

18   Q.   So you never discussed your testimony with your

19   father before you testified?

20   A.   No.  I'm going off the top of my head.

21   Q.   Okay.  And you didn't know that he would ask you

22   about the wages that the workers were earning?

23   A.   No.  No.

24   Q.   So that's a surprise to you?

25   A.   This is the first time I'm doing this in my life.

K. Nieto - Cross/Moser

49

1    Q.    And you understand that by testifying that the

2    workers were paid extra, you're protecting your dad?

3    A.    If that's the outcome, but it's the truth.

4    Q.    Okay.

5          And were you working -- how many months out of

6    the year were you working?

7    A.    It was a summer job.

8    Q.    When you say "a summer job"?

9    A.    So, June, maybe May til September.

10   Q.    Were you off of school at that point in time?

11   A.    Well, after I was out of high school, I was in

12   college.

13   Q.    Where were you in college?

14   A.    SUNY Farmingdale.

15   Q.    And was that full-time at SUNY Farmingdale?

16   A.    Yes, but the weekend -- it wasn't every day.  It was

17   full-time two or three days out of the week.

18   Q.    Okay.

19          How many -- how many credits were you taking?

20   And I'm -- let's go back to -- let's go to 2018.

21          THE COURT:  Wait.  Wait.  One question at a

22   time.

23          Start again.

24   BY MR. MOSER:

25   Q.    In 2018, were you in college?

*K. Nieto - Cross/Moser*

50

1    A.    I believe so.  I believe so.

2    Q.    And that was SUNY Farmingdale?

3    A.    Yes.

4    Q.    Taking how many credits?

5    A.    I -- I -- that I can't remember.  I -- I'm not sure

6    if full-time is 12 credits.  I'm -- I'm -- I can't really

7    remember, honestly.

8    Q.    Were you registered as a full-time student?

9    A.    Yes.

10   Q.    2019 were you in college?

11   A.    No.

12   Q.    Did you graduate in 2018?

13   A.    Not from that school.

14   Q.    Okay.

15         So did you ever obtain a degree from SUNY

16   Farmingdale?

17   A.    No.

18   Q.    What have you been doing since you stopped attending

19   SUNY Farmingdale?

20   A.    I attended a different college where I got my

21   associate's.

22   Q.    And which college was that?

23   A.    Island Drafting Technical Institute in Amityville.

24   Q.    And when did you attend Island Drafting?

25   A.    2021.

*K. Nieto - Cross/Moser*

1    Q.    What did you do between time that you --

2          MR. MOSER:  Withdrawn.

3    Q.    When did you stop attending SUNY Farmingdale?

4    A.    I believe that same year, 2018.

5    Q.    So you only worked for your dad in the summer?

6    A.    Yes, from high school every summer or a weekend I had

7    free I would work with my dad.

8    Q.    How many days a week?

9    A.    Well, during school, the weekends.  So, I don't know,

10   Saturday, Sunday if he had, you know, some maintenance I

11   would go along with him.

12   Q.    What kind of work would you do on Saturday and Sunday

13   for your dad?

14   A.    Well, if it's an actual job, I would help bring the

15   branches into the chipper to make mulch.

16   Q.    And how many Saturdays did you actually work, let's

17   say in 2018?

18   A.    Well, we're talking about years here.  I can't give a

19   number of how many Saturdays.

20   Q.    And is there any record that you actually worked for

21   Paradise?

22   A.    Official records, no.

23   Q.    You never received a paycheck?

24   A.    No.

25   Q.    Do you have any documents that would show that you

*K. Nieto - Cross/Moser*

52

1  actually worked for Paradise?

2  A.    Actual documents, no.

3  Q.    And you mentioned that your dad paid extra?

4  A.    Correct.

5  Q.    So you were present when the employees were paid?

6  A.    Yes.

7  Q.    And do you recall a specific instance out of all

8  these times when employees were paid?

9  A.    In front of our own home.

10  Q.    Okay.  Describe for me how that happened.

11  A.    Well, they would come to the house in the car of

12  Jorge Maldonado, and my dad would just hand them the cash.

13  You know, sometimes he would invite them in 'cause they

14  were, you know, I guess, friends at that time.

15  Q.    So what did you see?  What did you see happen when

16  they were paid?

17  A.    They gave them -- he gave them the cash in the hand.

18  Q.    Okay.

19         When he handed them the cash, did he have all of

20  the bills together?

21         THE COURT:  I don't understand the question.

22         THE WITNESS:  Yeah, I don't either.

23  BY MR. MOSER:

24  Q.    Well, did he count out the money in front of you?

25  A.    Well, yeah.  Yeah, if it was per day, yes, here's

K. Nieto - Cross/Moser

1    150.  If you worked more or, look, here's a tip from the

2    customer, here's an extra 40 or 50.

3    Q.    So he would count out this extra money in front you?

4    A.    Yeah, that's what I'm saying.

5    Q.    And would you be -- where would you be when this was

6    going on?

7    A.    Right there on the same floor.

8    Q.    Of your house?

9    A.    Right.

10   Q.    Okay.  Did you ever see any record of the cash that

11   was paid?

12   A.    No, no record.

13   Q.    And how many times did you see your dad pay extra?

14   A.    It would be often.  Again, like if we go over four

15   o'clock, right, like we know it's 150 a standard day, but

16   if we go over, yeah, he -- he will compensate for that.

17   He'll even include the lunch so we wouldn't have to buy

18   lunch.

19   Q.    And when was Hector Hernandez employed by Paradise?

20   A.    Honestly, I'm not sure.

21   Q.    Can you give me any approximation?

22   A.    I think I've seen him once in 2019, but honestly,

23   I -- I don't really know him.

24   Q.    How about Jonathan, when did Jonathan work for

25   Paradise?

*K. Nieto - Cross/Moser*

54

1   A.   For a while.  Definitely around 2017, maybe before.

2   Honestly, I'm -- I can't really recall.

3   Q.   And when did he stop working for Paradise?

4   A.   I would say around the pandemic maybe.

5   Q.   Are you guessing?

6   A.   I -- I am guessing 'cause at that point, I wasn't

7   working with my dad.

8   Q.   Okay.

9        You testified that you would also be present --

10   he worked during the summer and that's how you knew what

11   the wages were being paid, correct?

12   A.   Right.

13   Q.   But when they came to your house, was that during the

14   summer, or was that some other time?

15   A.   No, sometimes it would be, like -- like during the

16   school week.

17   Q.   Okay.

18        And how much did Paradise pay Hector Hernandez

19   per day?

20   A.   I -- I can't answer because I -- again, I've maybe

21   seen him once in my life.

22   Q.   How much did Paradise pay Jonathan Barahona per day?

23   A.   150.

24   Q.   Throughout his entire employment?

25   A.   Yes.

*K. Nieto - Cross/Moser*

55

1  Q.   And can you name any specific days on which he earned

2  more than $150 a day?  Give me any date.

3  A.   When Hurricane Irene happened, so I -- I don't know

4  when that was, but that was obviously emergency jobs,

5  trees on top of houses.  So yes, in those instances, they

6  were paid definitely over $200.

7  Q.   How do you know that?

8  A.   'Cause that's what I was paid and -- and that's where

9  I saw that everyone got the same amount.

10  Q.   And how many hours were you working when -- in the

11  aftermath of Hurricane Irene?

12  A.   Probably more than eight hours.

13  Q.   How much more?

14  A.   Well, the sun was still up when we finished, so it

15  couldn't have been past 7 o'clock.

16  Q.   Did your -- and how much extra did your dad pay?

17  A.   Like he said, it could have been 50, 40, and, you

18  know, that's also including the lunch.

19  Q.   How much extra did he pay to Jonathan Barahona if

20  Jonathan worked after four?

21  A.   That I -- I -- I can't really answer that, honestly.

22  Q.   How much would he pay to Hector Hernandez if Hector

23  Hernandez worked after four?

24  A.   I have no idea.  To me he's like a new worker.

25       MR. MOSER:  No further questions.

*K. Nieto - Cross/Moser*

56

```
1         THE COURT:  Anything else, sir, for him?

2         MR. NIETO:  No.

3         THE COURT:  Okay.

4         Sir, you can step down.

5         THE WITNESS:  Okay.

6         THE COURT:  Thank you for your time.

7         (The witness leaves the witness stand.)

8         THE COURT:  Do you have any other witnesses?

9         MR. MOSER:  No.

10        THE COURT:  I'm sorry, you don't have any other

11   witnesses, do you?

12        MR. NIETO:  What's that?

13        THE COURT:  Any further witnesses?

14        MR. NIETO:  No.

15        THE COURT:  Anything further?  Any other

16   witnesses?

17        MR. MOSER:  No.  Except for post-trial.

18        THE COURT:  We're going to take lunch, we're

19   going to take an hour, and we're going to come back and

20   talk about what next.

21        MR. MOSER:  Understood.

22        THE COURT:  But I have questions here including,

23   I don't know what everyone thinks they've proven, I have

24   some thoughts about that.  But if the plaintiffs have

25   proven any kind of overtime issue, what's the calculation?
```

*K. Nieto - Cross/Moser*

57

1    How are you going to calculate this?  That's really what I

2    want to hear from you.

3           And you can think about that too, sir.

4           There's one piece of this that I think is pretty

5    easy, there were no records.  Everyone agrees there were

6    no wage statements, hiring notices.  So whatever penalty

7    is associated with that I think is not in issue.

8           Overtime is the question.  You know, I know

9    counsel objected to, forgive me for using his first name,

10   but Kevin, just to clarify who was testifying, there is a

11   good issue about the sun going down.  I don't know that

12   you're working 9 o'clock at night in March cutting trees.

13   That makes no sense to me at all.

14          MR. K. NIETO:  You can't see.

15          THE COURT:  Correct.  There are limbs that get

16   out off, and they're not tree limbs, they're human limbs

17   that cut off in the darkness.  So there is an issue if

18   there's a overtime time how you go about calculating it.

19   Everyone take the next hour to think about that.  Meet

20   back here at a quarter to two and figure it all out.

21          Make sure we get the interpreter available for

22   Mr. Nieto if there's any interpreting necessary.

23          THE INTERPRETER:  This is the interpreter.  I

24   will remain on the line until I'm dismissed by the judge.

25   Just let me know if you want me to.

*K. Nieto - Cross/Moser*

58

1          (Luncheon recess taken.)

2                    AFTERNOON SESSION

3            (In open court.)

4          THE COURT:  Mr. Moser, I think, wanted to make

5     some arguments to me, yes?

6          MR. MOSER:  Yes, I do.

7          THE COURT:  Before you do that, I just want to

8     remind you, do we have the interpreter on the line?

9          THE INTERPRETER:  The interpreter is right here,

10    your Honor.

11         THE COURT:  Okay.  Mr. Moser, not for my sake,

12    obviously, but for the sake of defendants, as well as your

13    clients, you will have to make your argument in bite-size

14    chunks so she can interpret them.  So you'll just pause,

15    please.

16         Yes?

17         MR. MOSER:  Yes.  Yes.

18         THE COURT:  Have at it.  What would you like to

19    say to me, sir?

20         MR. MOSER:  I think the biggest issue in this

21    case is how could these two men have worked these long

22    hours, and I think the Court honed in on the sunset time.

23    And luckily for us, the National Weather Service does

24    publish sunset times, and when I looked at those sunset

25    times, the only two months when the day from beginning at

*K. Nieto - Cross/Moser*

59

 1   7 a.m. until sunset was less than 12 was October and

 2   November.

 3                THE COURT:  I don't care about less than 12.

 4                Did the sun go down before 7 o'clock?  Because

 5   if it did, then your client didn't work past 7 o'clock,

 6   right?

 7                MR. MOSER:  That's correct.

 8                THE COURT:  Yeah.

 9                MR. MOSER:  So we're talking about the sunset

10   time for most of the year, for instance March --

11                THE COURT:  Hold on.  We have to give her time

12   to translate.

13                MR. MOSER:  I'm sorry.

14                THE INTERPRETER:  Okay.

15                (Translating.)

16                MR. MOSER:  So, when we look at from March

17   through September, those months, the sun sets in each one

18   of those months after 7 p.m., and according to those same

19   National Weather Service information, the average sunset

20   time in October was approximately 6:15 p.m.

21                Because of daylight savings time, it goes down

22   drastically in November.  It goes down to 4:40 p.m.

23   Keeping in mind that if they worked through the daylight

24   hours, they would still have to travel back to the yard to

25   unload the truck, and they were not free to go until they

*K. Nieto - Cross/Moser*

1    got back to the yard.

2         So what I'm saying is that for the months from

3    March through October, it's entirely feasible that these

4    individuals did work from 7 a.m. to 7 p.m., or even later.

5         That's all I wanted to talk about in terms of

6    the times worked.

7         THE COURT:  Okay.

8         What else would you like to say?

9         MR. MOSER:  I'd like to point out that the

10   employer has absolutely no records whatsoever, and the

11   only witness that claims the individuals were paid extra

12   for working more time is the defendant's son who claims

13   that he did not even know that he was going to talk about

14   them being paid extra today because the employer has not

15   refuted the testimony of the plaintiffs concerning their

16   hours worked and their wages paid.  The testimony

17   regarding the plaintiffs stands.

18        Now, on another note, Mr. Nieto operated this

19   business basically licitly for 17 years in the state of

20   New York.  He admitted at his deposition, which is before

21   the Court, that he did not report that either Hector

22   Hernandez or Jonathan Barahona were even working for him.

23   And this is an industry where there is a chance of death

24   and serious injury every single day.

25        Mr. Nieto has been put on this notice, because

**K. Nieto - Cross/Moser**

61

 1    of this lawsuit, that the failure to -- I'll withdraw

 2    that.

 3            He's been put on notice, because of this

 4    lawsuit, that paying employees off the books violates

 5    multiple labor and criminal laws, and rather than bring

 6    his company into compliance, he has now opened up shop in

 7    the state of Pennsylvania.  And I didn't ask him, but I'm

 8    sure that he would tell the Court that all of the

 9    employees at his new business are paid on the books.

10            THE COURT:  When you're done with invective and

11    would like to return to something relevant, I actually

12    have questions.

13            MR. MOSER:  Yes.

14            THE COURT:  But you can do whatever you want.

15            MR. MOSER:  I am done.

16            THE COURT:  You can do whatever you want.

17            MR. MOSER:  I am done, yes.

18            THE COURT:  Okay, good.

19            Let's talk about a few things.

20            The first one is you talked about not receiving

21    the wage statements and the wage notice.  Now, the Second

22    Circuit has suggested in the wake of the Transunion

23    decision, that there are some new rules we have to

24    implement.  By which of example, in the Guthrie case, in

25    discussing standing, in the case that plaintiff could show

1    that, quote, inaccurate or non-compliant notices prevented

2    the employee from obtaining full payment of wages in a

3    timely fashion, unquote, that that plaintiff would then

4    establish standing on these claims.

5         Given that the plaintiffs testified that they

6    well knew they were being underpaid and not being paid in

7    compliance with law, but needed the job anyway, how does

8    that square with Guthrie?

9         MR. MOSER:  The prejudice is evident in the need

10   for a trial.  If Mr. Nieto had simply provided a wage

11   statement and kept accurate records, provided those

12   accurate wage statements, none of this would be necessary,

13   and it's taken years of litigation for this to reach the

14   Court.  I think that that is sufficient prejudice to

15   establish standing.

16        If the Court decides that it is not, I would ask

17   that the Court dismiss those claims without prejudice so

18   that I may file a motion for summary judgment in lieu of a

19   complaint in state court.

20        THE COURT:  Okay.  That's interesting.

21        In terms of liquidated -- well, I think you

22   would agree with me, Mr. Moser, there was no evidence

23   adduced about the income of the company that would

24   establish that the threshold under the FLSA was met, so

25   this would be simply a calculation of the New York State

*K. Nieto - Cross/Moser*

63

1   labor law.

2         Would you agree with me?

3         MR. MOSER:  I would suggest that the Court

4   already struck the answer of the defendant Paradise and

5   admitted the allegations against Paradise concerning the

6   income threshold, but to the extent that the Court would

7   still exercise jurisdiction over the New York Labor Law

8   claims, we would stipulate that we will resort to the New

9   York Labor Law.

10        THE COURT:  Yeah, I don't think it matters,

11  right?

12        MR. MOSER:  No, it does not.

13        THE COURT:  What else?

14        MR. MOSER:  Inasmuch as we're looking at the New

15  York Labor Law, it's Mr. Nieto that has the burden of

16  proof with regard to showing that my clients were

17  adequately compensated in accordance with the law.

18        And with regard to willfulness, I don't have the

19  cites in front of me, your Honor, but there are many

20  decisions in which courts have held that an employer's

21  practice of paying people off the books, not reporting

22  their wages, not tracking their hours is indicative of

23  willfulness.

24        If the Court would like a post-trial letter not

25  to exceed two pages or three pages, I'd be happy to do

*K. Nieto - Cross/Moser*

1  that if the Court would want that, if the Court so

2  chooses.

3          THE COURT:  Do you have a damages calculation?

4          MR. MOSER:  Excuse me?

5          THE COURT:  Do you have a damages calculation?

6          MR. MOSER:  Yes, I do.

7          THE COURT:  What is that calculation?

8          MR. MOSER:  I have to revise that calculation.

9  I would need ten minutes to do so.

10          THE COURT:  Revise it based on what?

11          MR. MOSER:  We have the damage calculations that

12  were submitted in support of the motion for -- in support

13  of the default judgment.

14          Let me pull those up.

15          (Pause.)

16          MR. MOSER:  Those calculations are a grand total

17  of $477,559.10.

18          THE COURT:  Well, I have so many questions.

19  I'll limit it to one.

20          MR. MOSER:  Yes, sir.

21          THE COURT:  Does that calculation include a

22  calculation for prejudgment interest?

23          MR. MOSER:  It includes prejudgment interest,

24  yes, and liquidated damages.

25          THE COURT:  Right.  But let's stay with

*K. Nieto - Cross/Moser*

1    prejudgment interest.

2         My understanding is that I believe the statute

3    says the Court may award prejudgment interest.

4         Is it discretionary, in your view?

5         MR. MOSER:  It says the court shall allow such

6    employee to recover the full amount of any underpayment,

7    all reasonable attorney's fees, prejudgment interest and,

8    unless the employer provides good faith basis, an

9    additional amount is liquidated damages.

10         So our position would be that the prejudgment

11    interest is mandatory.

12         THE COURT:  So, Mr. Nieto, that was a lot.  But

13    do you have anything you would like to say before I reach

14    a decision?

15         MR. NIETO:  I don't understand that question.

16         THE COURT:  What else would you like to say to

17    me?

18         MR. NIETO:  What I think is that I don't think

19    that what they're asking is fair because I feel I have

20    complied with all the payments.

21         THE COURT:  Okay.  What else?

22         MR. NIETO:  Because of that, I am refusing to

23    pay any such amount that is so exaggerated because I do

24    know that I've always paid them.  That's it.

25         THE COURT:  Okay.

*K. Nieto - Cross/Moser*

66

1          Mr. Moser, anything further?

2          MR. MOSER:  No, sir.

3          THE COURT:  All right.

4          I am going to read a decision into the record.

5     I'll do my best to allow the interpreter to interject with

6     translations so everyone knows what we're doing here.

7          All right.  So, before the Court for trial today

8     was this matter brought under the New York Labor Law and

9     the federal equivalent thereof, which becomes less

10    important as I'll explain momentarily.

11         THE INTERPRETER:  I'm sorry, your Honor, the

12    last part of your -- I could not hear clearly the last

13    part of your sentence.

14         THE COURT:  Well, I'm not reading something, so

15    this is going to be hard.  So I'll just try to wing it

16    again.

17         Before this Court came this action under the New

18    York Labor Law and the FLSA, the second part of which

19    becomes less important, as I will explain momentarily.

20         There are several claims which will drop out

21    immediately.  I believe the plaintiff abandoned the

22    minimum wage and spread of hours pay claims, so those will

23    be dismissed.

24         I will not consider plaintiff's claims under the

25    FLSA because no showing was made that the subject

*K. Nieto - Cross/Moser*

1   enterprise earned enough money to affect interstate

2   commerce, meaning the $500,000 income minimum was not

3   demonstrated.

4           What that leaves us with then are the unpaid

5   overtime violations under the New York Labor Law and the

6   wage statement and wage notice claims also under the New

7   York Labor Law.

8           Ironically, though there are no factual issues

9   in dispute regarding the paper documentary claims, meaning

10  the wage statement and wage notice claims, there is a

11  legal issue that gives us some pause.  Here the Second

12  Circuit in 2024 found that, "A plaintiff must show some

13  causal connection between a lack of accurate notices and

14  the downstream harm."  And that's from a case called

15  Guthrie.

16          Further, while the "legislature may have

17  intended to empower employees to advocate for themselves,

18  unless the plaintiff employee can show that he or she

19  would have undertaken such advocacy and plausibly would

20  have avoided some actual harm or obtained some actual

21  benefit if accurate notices had been provided, the

22  plaintiff employee has not established a concrete injury

23  in fact sufficient to confer standing to seek statutory

24  damages under Section 195" in that case.  And again that's

25  a quote from Guthrie.

*K. Nieto - Cross/Moser*

1          And again I'll cite what I read earlier.  For

2    example, if plaintiff can show that "inaccurate or

3    non-compliant notices prevented the employee from

4    obtaining full payment of wages in a timely fashion, then

5    the plaintiff can establish standing on these claims."

6    Again a quote from Guthrie.

7          Here the evidence is quite the opposite.  In

8    other words, the plaintiffs testified that they knew they

9    were being paid what was, in their view, unfairly or

10   improperly, and yet they needed the jobs and kept working

11   anyway.  So I find there is no showing here that the

12   provision of notice or wage statements would have made any

13   difference.

14          Counsel invites the Court to dismiss those

15   claims without prejudice based on the fascinating question

16   of how those claims might play out in state court, a

17   question that I am pleased to not have to answer.  I will

18   simply accept counsel's invitation and dismiss those

19   claims without prejudice to re-filing in state court if

20   it's so merited and if it makes any sense to do so.

21          What that means is the only claim before this

22   Court on the record that currently exists is the New York

23   Labor Law claim.  For overtime pay the New York Labor Law

24   requires an employer to "pay an employee for overtime at a

25   wage rate of one and one-half times the employee's regular

1  rate in the manner and methods provided in the Fair Labor

2  Standards Act."  And that's at 12 New York CRR Section

3  142-2.2.

4          To state a claim under the NYLL, a plaintiff

5  must "sufficiently allege 40 hours of work in a given

6  workweek, as well as some uncompensated time in excess of

7  the 40 hours."  And that's from a Second Circuit case from

8  2013 called Lundy versus Catholic Health Systems.

9          The New York Labor Law not only permits recovery

10  of any amounts properly demonstrated, but also allows for

11  something called liquidated damages.  Under the NYLL,

12  "unless the employer proves a good faith basis to believe

13  that its underpayment of wages was in compliance with the

14  law, an additional amount as liquidated damages equal to

15  100 percent of the total amount of the wages found to be

16  due may be recovered by the plaintiff."  And that's New

17  York Labor Law Section 198(1-a).

18          It is also the case that the NYLL not only

19  provides for liquidated damages, but it provides for

20  attorney's fees, which we'll deal with separately if

21  appropriate, as well as prejudgment interest.  In that

22  regard, under the NYLL, prejudgment interest may be

23  awarded in addition to liquidated damages, and I'm going

24  to cite Reilly versus NatWest Markets Group, 181 F.3d 253,

25  which is the Second Circuit from 1999.

*K. Nieto - Cross/Moser*

70

1           Okay.  Which brings me to the facts of the case.

2           It is beyond doubt that the plaintiffs worked

3  some overtime hours that were not properly compensated

4  for.  When I say "beyond doubt," I will point to the

5  affidavit of the defendant Mr. Nieto who, in his

6  affidavit, said "I paid overtime wages to the plaintiff at

7  a rate of $30 per half-hour worked past 6 p.m. and $50 for

8  every hour worked past 6 p.m."  And that's from DE-14.

9           Even if that statement were entirely true, which

10 it may not have been, it's clear from his affidavit that

11 the workday started at, according to him, 8 a.m. and then

12 finished at the yard from the hours of 4 to 6 p.m.  The

13 problem with that is, obviously, if they began work at 8

14 and the defendant didn't start paying overtime until after

15 6, well, then he has obviously not paid them for overtime

16 worked because that's more than an eight-hour day.

17          In addition, the defendant and, as I understand

18 it, the defaulting company, failed to maintain employment

19 records for the hours worked, and hence, there is certain

20 presumption that arises in the law concerning the

21 evidentiary balance here.

22          At the same time, the plaintiffs' testimony

23 raises doubts in the Court's mind concerning the precision

24 and accuracy of that testimony, as well as certain

25 assumptions that were built therein.  Did they work five

*K. Nieto - Cross/Moser*

71

1    or six days a week?  Did they work one or two days a week

2    in the off-season?  Did they work in the dark?  All of

3    these questions gives me some pause in attempting to

4    calculate a reasonable amount of overtime worked here.

5           Importantly, the plaintiffs offered no

6    corroborating evidence such as a personal diary or any

7    other sort of document that would give the ability of the

8    Court to fix a precise number of hours here.  Fortunately,

9    the law allows the Court in precisely this situation to

10   come up with a reasoned estimate based on the evidence

11   available to it, which as I have already suggested has

12   problems for both sides.

13          So, here goes.  To calculate the plaintiffs'

14   intended hourly rate, I will use the traditional measure

15   of such matters which in finding that the plaintiffs, I

16   think everyone agrees, were paid $150 per day for five

17   days of work per week during the busy season March to

18   November.  That means that during those periods, the

19   plaintiffs' hourly rate was 18.75 an hour, meaning $750 a

20   week for 40 hours work.  Do the division, I believe that

21   comes out to 18.75.  By extension, to the extent that the

22   plaintiffs were owed and demonstrated overtime hours, they

23   were owed $28.125 for each overtime hour worked, meaning

24   18.75 times 1.5, and that gives us the 28.125.

25          It is clear to the Court that during the course

72

1    of the season, the hours obviously varied greatly,

2    extending longer on longer days in the summer and

3    obviously got shorter as the season began or ended.  So

4    the Court has devised an estimate to average out these

5    numbers and thereby credits the plaintiffs with having

6    worked ten-hour days during the busy season, meaning March

7    through November.  Taking the overtime rate of 28.125 and

8    multiplying it by a extra ten hours of overtime,

9    uncompensated overtime per week, equals 281.25 of

10   uncompensated overtime per week, which across the course

11   of a 36-week busy season would be a total of $10,125 per

12   plaintiff per busy season that they worked.  In terms of

13   the balance of the year, meaning December through

14   February, by anyone's account, they were only working one

15   or two days per week, and hence overtime is not an issue.

16           So what does that mean?

17           Let's do the calculations for each plaintiff,

18   beginning with Mr. Barahona.  The evidence seems to

19   demonstrate that he worked from March of 2017 up until

20   June of 2021.  What that means is he worked a little bit

21   more than four years, or four seasons.  So awarding him

22   the $10,125 per season over the four years would total

23   $40,500, adding another eight weeks for the last year,

24   which it seems that he worked about two months in the last

25   year, would be another $2,250.  So that would be the base

*K. Nieto - Cross/Moser*

73

1   amount of his overtime damages.

2          As counsel properly points out, the standard for

3   willfulness, as we call it in federal law, is actually

4   inverted under state law, such that the defendant would

5   have to show that he was paying consistent with law, which

6   he cannot.  So therefore, the question of double damages

7   comes to the fore.  What that means is that the judgment

8   for Mr. Barahona is $85,500.

9          Mr. Hernandez's calculation is much more

10  straightforward because it deals with a much shorter

11  period of time.  While he worked occasionally prior to the

12  one busy season that he worked, those periods don't matter

13  for the purposes of overtime calculation.  So for the one

14  busy season that he worked, the Court will award him

15  $10,125.  Again as New York law requires in these

16  circumstances, doubling that damage the total judgment to

17  Mr. Hernandez is $20,250.

18          I have not done a calculation on prejudgment

19  interest because it is unclear to me as to what the

20  accrual date will be, but that's okay.  I think we can

21  leave that open for an order to be submitted by

22  plaintiffs' counsel laying this all out.

23          And if plaintiffs' counsel wishes to pursue

24  attorney's fees, he'll do that in a separate application.

25          Additionally, I will note that the default

K. Nieto - Cross/Moser

74

1  judgment was not complete as against the entity.  If it's

2  still extant, I don't know, but nevertheless, if

3  plaintiffs' counsel wishes to include in that order an

4  equivalent judgment, an equal judgment as against the

5  company, you could feel free to do so.

6        Let me ask plaintiffs' counsel how long do you

7  need to settle an order, serve it and then serve it on the

8  Court?

9        MR. MOSER:  Would that be with regard to the

10  entire application or simply with regard to the judgment

11  today?

12        THE COURT:  Well, I guess there's two pieces of

13  that.  I would suggest that you settle an order on the

14  judgment today and whatever you're going to seek in

15  prejudgment interest.

16        Do you know what the accrual date would be that

17  you would seek?

18        MR. MOSER:  Excuse me?

19        THE COURT:  The accrual date, what would be

20  the -- I mean, why don't you figure that --

21        MR. MOSER:  Yeah.  So I'll submit an order, I

22  can do it by close of business Wednesday.

23        THE COURT:  Okay.  But it would include

24  prejudgment interest?

25        I would suggest if you can't -- look, we could

*K. Nieto - Cross/Moser*

75

 1   fight about this for a long time, I don't think it matters

 2   that much, but you could use the filing of the Complaint

 3   as the date, that would be no question, if you wanted to.

 4           MR. MOSER:  Correct.

 5           THE COURT:  So if you do that, then submit that

 6   by Wednesday.  And once that's done, then you can talk

 7   about attorney's fees after, yeah?

 8           MR. MOSER:  Understood.

 9           THE COURT:  All right.

10           Mr. Nieto, anything else I can do for you today?

11           MR. NIETO:  What was the question?

12           THE COURT:  I need the interpreter's help here.

13           Mr. Nieto, is there anything else I can do for

14   you today?

15           Give me one second.  Let me explain what's going

16   to happen next.  Counsel's going to draft a written order

17   which he's going to send to you, which will contain the

18   judgment I just rendered, as well as an interest

19   calculation.  You can look at that.  If you have concerns

20   about it or corrections or whatever, you can let me know

21   in writing.  Okay?

22           MR. NIETO:  That's fine.

23           THE COURT:  Thank you, everyone.

24           Good job today.  See you soon.

25           (Time noted:  2:58 p.m.)

76

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct

transcript of the record of proceedings in the

above-entitled matter.

_____
                Marie Foley, RMR, CRR
                Official Court Reporter

77

**I N D E X**

**WITNESS**                                                    **PAGE**

**WILLIAM NIETO**


    DIRECT EXAMINATION
    BY MR. MOSER                                              9


**JONATHAN BARAHONA**
    DIRECT EXAMINATION
    BY MR. MOSER:                                            32
    CROSS-EXAMINATION
    BY MR. NIETO                                             36


**HECTOR HERNANDEZ**
    DIRECT EXAMINATION
    BY MR. MOSER                                             39
    CROSS EXAMINATION
    BY MR. NIETO                                             44


**KEVIN NIETO**
    DIRECT EXAMINATION
    BY MR. NIETO                                             47
    CROSS-EXAMINATION
    BY MR. MOSER                                             48

1

## $

**$10,125** [3] - 72:11, 72:22, 73:15
**$150** [4] - 28:24, 43:1, 55:2, 71:16
**$2,250** [1] - 72:25
**$20** [1] - 24:20
**$20,250** [1] - 73:17
**$200** [5] - 24:4, 24:15, 28:25, 29:4, 55:6
**$28.125** [1] - 71:23
**$30** [3] - 29:11, 29:16, 70:7
**$300** [1] - 29:6
**$40,500** [1] - 72:23
**$477,559.10** [1] - 64:17
**$50** [3] - 29:11, 29:16, 70:7
**$500,000** [1] - 67:2
**$600** [1] - 36:23
**$750** [1] - 71:19
**$85,500** [1] - 73:8

## 1

**1** [1] - 47:14
**1.5** [1] - 71:24
**100** [1] - 69:15
**11726** [2] - 1:20, 10:3
**11743** [1] - 1:16
**12** [8] - 1:7, 17:20, 33:14, 35:24, 50:6, 59:1, 59:3, 69:2
**14** [1] - 25:1
**142-2.2** [1] - 69:3
**15** [3] - 17:14, 17:19, 33:1
**150** [11] - 24:1, 29:3, 29:21, 30:13, 34:2, 40:11, 40:12, 47:20, 53:1, 53:15, 54:23
**16** [4] - 15:16, 16:2, 21:10
**17** [2] - 21:11, 60:19
**170** [1] - 24:2
**175** [1] - 24:15
**18.75** [3] - 71:19, 71:21, 71:24
**180** [1] - 24:3
**181** [1] - 69:24
**193** [4] - 1:19, 9:24, 10:3, 22:1
**195** [1] - 67:24
**198(1-A)** [1] - 69:17
**1999** [1] - 69:25

## 2

**2** [4] - 35:13, 35:22, 40:4, 47:14
**20** [4] - 10:5, 33:1

**200** [4] - 24:3, 24:11, 29:9, 30:14
**2001-5400** [1] - 2:2
**2007** [2] - 11:11
**2013** [1] - 69:8
**2017** [8] - 20:15, 28:23, 32:25, 35:6, 35:9, 54:1, 72:19
**2018** [12] - 20:16, 28:23, 28:24, 39:21, 41:16, 41:19, 41:25, 49:20, 49:25, 50:12, 51:4, 51:17
**2019** [10] - 13:7, 16:16, 16:18, 28:24, 39:22, 41:14, 42:7, 42:8, 50:10, 53:22
**2020** [8] - 13:7, 16:17, 16:19, 39:22, 41:6, 41:12, 43:13
**2021** [9] - 25:24, 33:1, 35:7, 35:9, 41:6, 41:10, 41:12, 50:25, 72:20
**2022** [1] - 21:11
**2023** [1] - 14:20
**2024** [2] - 11:13, 67:12
**2025** [1] - 1:7
**21-CV-5400** [1] - 1:3
**22** [2] - 10:6, 16:2
**220** [2] - 24:7, 24:11
**25** [2] - 15:15, 24:20
**253** [1] - 69:24
**26** [1] - 46:20
**28.125** [2] - 71:24, 72:7
**281.25** [1] - 72:9
**2:58** [1] - 75:25

## 3

**3** [2] - 35:13, 40:4
**30** [2] - 10:5, 29:16
**32** [1] - 77:10
**36** [1] - 77:12
**36-WEEK** [1] - 72:11
**39** [1] - 77:16

## 4

**4** [6] - 23:19, 24:16, 30:19, 30:25, 42:18, 70:12
**40** [5] - 53:2, 55:17, 69:5, 69:7, 71:20
**44** [1] - 77:18
**47** [1] - 77:22
**48** [1] - 77:24
**4:40** [1] - 59:22

## 5

**5** [2] - 1:16, 35:12
**50** [3] - 29:16, 53:2, 55:17

## 6

**6** [7] - 30:18, 35:12, 40:2, 70:7, 70:8, 70:12, 70:15
**631** [1] - 1:23
**645** [1] - 40:9
**6:00** [1] - 29:12
**6:15** [1] - 59:20

## 7

**7** [11] - 11:13, 40:8, 40:14, 41:1, 55:15, 59:1, 59:4, 59:5, 59:18, 60:4
**712-6104** [1] - 1:23
**7:30** [1] - 33:15
**7TH** [1] - 14:20

## 8

**8** [4] - 40:14, 41:1, 70:11, 70:13

## 9

**9** [5] - 15:16, 16:2, 17:19, 57:12, 77:6
**9:15** [1] - 6:25
**9:30** [1] - 1:7

## A

**A.M** [4] - 1:7, 59:1, 60:4, 70:11
**ABANDONED** [1] - 66:21
**ABBREVIATE** [1] - 21:2
**ABBREVIATING** [1] - 22:12
**ABILITY** [1] - 71:7
**ABLE** [3] - 2:17, 15:1, 23:18
**ABOVE-ENTITLED** [1] - 76:5
**ABSOLUTELY** [1] - 60:10
**ACCEPT** [2] - 19:7, 68:18
**ACCORDANCE** [1] - 63:17
**ACCORDING** [4] - 7:23, 26:14, 59:18, 70:11
**ACCOUNT** [1] - 72:14
**ACCRUAL** [3] - 73:20, 74:16, 74:19
**ACCURACY** [1] - 70:24
**ACCURATE** [4] - 62:11, 62:12, 67:13, 67:21
**ACT** [1] - 69:2
**ACTION** [1] - 66:17
**ACTUAL** [4] - 51:14, 52:2, 67:20
**ADD** [3] - 27:9, 27:11, 27:13

**ADDING** [1] - 72:23
**ADDITION** [3] - 23:12, 69:23, 70:17
**ADDITIONAL** [3] - 34:10, 65:9, 69:14
**ADDITIONALLY** [1] - 73:25
**ADDUCED** [1] - 62:23
**ADEQUATELY** [1] - 63:17
**ADMITTED** [2] - 60:20, 63:5
**ADVOCACY** [1] - 67:19
**ADVOCATE** [1] - 67:17
**AFFECT** [1] - 67:1
**AFFIDAVIT** [9] - 21:9, 21:24, 22:15, 25:2, 28:18, 28:21, 70:5, 70:6, 70:10
**AFIELD** [1] - 26:19
**AFTERMATH** [1] - 55:11
**AFTERNOON** [1] - 58:2
**AFTERNOON** [4] - 30:20, 32:6, 32:7, 39:11
**AGO** [1] - 28:8
**AGREE** [2] - 62:22, 63:2
**AGREED** [1] - 19:17
**AGREES** [2] - 57:5, 71:16
**AHEAD** [9] - 2:17, 7:15, 9:22, 21:5, 21:12, 22:13, 22:17, 30:4, 31:2
**AIDED** [1] - 1:25
**AL** [2] - 2:3, 2:4
**ALLEGATIONS** [1] - 63:5
**ALLEGE** [1] - 69:5
**ALLOW** [3] - 46:25, 65:5, 66:5
**ALLOWS** [2] - 69:10, 71:9
**AMITYVILLE** [1] - 50:23
**AMOUNT** [11] - 24:11, 34:14, 40:10, 55:9, 65:6, 65:9, 65:23, 69:14, 69:15, 71:4, 73:1
**AMOUNTS** [2] - 46:25, 69:10
**ANSWER** [7] - 15:1, 37:23, 43:4, 54:20, 55:21, 63:4, 68:17
**ANSWER** [3] - 16:18, 17:22, 17:24
**ANSWERED** [3] - 10:23, 16:22
**ANSWERS** [1] - 4:12
**ANYWAY** [2] - 62:7, 68:11
**APOLOGIZE** [3] - 6:18, 7:10, 43:18
**APPEARANCE** [1] - 2:5
**APPLICATION** [2] - 73:24, 74:10
**APPROACH** [2] - 3:20, 24:23
**APPROPRIATE** [1] - 69:21
**APPROXIMATION** [1] - 53:21
**ARGUE** [1] - 38:11

**ARGUMENT** [3] - 27:12, 33:2, 58:13
**ARGUMENTS** [2] - 25:23, 58:5
**ARISES** [1] - 70:20
**ASSOCIATE'S** [1] - 50:21
**ASSOCIATED** [1] - 57:7
**ASSUMPTIONS** [1] - 70:25
**ATTEMPTING** [1] - 71:3
**ATTEND** [1] - 50:24
**ATTENDED** [1] - 50:20
**ATTENDING** [2] - 50:18, 51:3
**ATTENTION** [3] - 15:15, 17:14, 17:19
**ATTORNEY** [1] - 12:9
**ATTORNEY** [5] - 9:7, 27:2, 27:8, 27:10
**ATTORNEY'S** [4] - 65:7, 69:20, 73:24, 75:7
**AUDIO** [2] - 6:10, 6:11
**AUTHORITY** [2] - 18:8, 18:11
**AVAILABLE** [3] - 7:16, 57:21, 71:11
**AVERAGE** [2] - 59:19, 72:4
**AVOIDED** [1] - 67:20
**AWARD** [2] - 65:3, 73:14
**AWARDED** [1] - 69:23
**AWARDING** [1] - 72:21

## B

**BALANCE** [2] - 70:21, 72:13
**BARAHONA** [14] - 2:3, 13:5, 17:1, 17:21, 18:17, 19:10, 27:21, 31:9, 31:20, 54:22, 55:19, 60:22, 72:18, 73:8
**BARAHONA** [3] - 1:3, 31:21, 77:8
**BARAHONA'S** [1] - 22:20
**BASE** [1] - 72:25
**BASED** [3] - 64:10, 68:15, 71:10
**BASIS** [2] - 65:8, 69:12
**BATHROOM** [1] - 31:10
**BATHROOMS** [1] - 31:12
**BECAME** [1] - 26:13
**BECOME** [2] - 34:7, 41:12
**BECOMES** [2] - 66:9, 66:19
**BEFORE** [1] - 1:12
**BEGAN** [2] - 70:13, 72:3
**BEGIN** [2] - 41:25, 42:9
**BEGINNING** [5] - 29:3, 29:21, 41:18, 58:25, 72:18
**BENCH** [1] - 17:6
**BENCH** [1] - 1:12
**BENEFIT** [1] - 67:21
**BEST** [1] - 66:5
**BETTER** [3] - 3:14, 4:15, 26:12

**BETWEEN** [4] - 16:18, 35:9, 51:1, 67:13
**BEYOND** [2] - 70:2, 70:4
**BIG** [1] - 46:5
**BIGGEST** [1] - 58:20
**BILLS** [1] - 52:20
**BIT** [3] - 24:6, 37:6, 72:20
**BITE** [1] - 58:13
**BITE-SIZE** [1] - 58:13
**BOOKS** [3] - 61:4, 61:9, 63:21
**BOSS** [1] - 13:13
**BOUGHT** [1] - 34:8
**BRANCHES** [1] - 51:15
**BRANCHS** [1] - 39:18
**BREAK** [2] - 31:10, 37:6, 38:20
**BREATHING** [1] - 28:4
**BRING** [1] - 17:8, 17:11, 51:14, 61:5
**BRINGS** [1] - 70:1
**BROUGHT** [1] - 66:8
**BROWN** [1] - 1:12
**BUCKET** [1] - 26:5
**BUILT** [1] - 70:25
**BURDEN** [2] - 3:5, 63:15
**BUSIEST** [1] - 33:8
**BUSINESS** [13] - 10:24, 11:4, 11:12, 11:22, 11:24, 12:2, 12:4, 12:6, 32:13, 32:17, 60:19, 61:9, 74:22
**BUSINESSES** [2] - 11:18, 11:20
**BUSY** [9] - 33:3, 33:6, 33:11, 71:17, 72:6, 72:11, 72:12, 73:12, 73:14
**BUY** [1] - 53:17
**BY** [34] - 1:17, 9:14, 13:1, 14:18, 15:5, 15:14, 16:1, 16:13, 17:18, 20:12, 21:13, 22:14, 25:9, 26:21, 29:23, 32:5, 36:17, 39:10, 41:4, 42:14, 43:10, 44:10, 47:8, 48:2, 48:13, 49:24, 52:23, 77:6, 77:10, 77:12, 77:16, 77:18, 77:22, 77:24

## C

**CALCULATE** [3] - 57:1, 71:4, 71:13
**CALCULATING** [1] - 57:18
**CALCULATION** [12] - 56:25, 62:25, 64:3, 64:5, 64:7, 64:8, 64:21, 64:22, 73:9, 73:13, 73:18, 75:19
**CALCULATIONS** [3] - 64:11, 64:16, 72:17
**CANNOT** [2] - 17:16, 73:6

**CAR** [1] - 52:11
**CARE** [7] - 5:15, 10:16, 10:19, 16:11, 27:1, 28:16, 59:3
**CARES** [1] - 43:6
**CASE** [12] - 2:2, 9:18, 58:21, 61:24, 61:25, 67:14, 67:24, 69:7, 69:18, 70:1
**CASH** [18] - 19:5, 19:7, 20:7, 20:10, 21:1, 23:10, 23:12, 34:15, 34:16, 44:14, 47:13, 48:5, 48:7, 52:12, 52:17, 52:19, 53:10
**CATHOLIC** [1] - 69:8
**CAUSAL** [1] - 67:13
**CAUSE** [1] - 1:12
**CDL** [2] - 26:7, 26:10
**CENTRAL** [1] - 1:5
**CERTAIN** [4] - 37:15, 40:10, 70:19, 70:24
**CERTIFICATE** [1] - 76:1
**CERTIFIED** [1] - 3:12
**CERTIFY** [1] - 76:3
**CHANCE** [5] - 21:15, 21:16, 23:9, 27:15, 60:23
**CHANGE** [1] - 34:3
**CHARGE** [1] - 32:22
**CHECK** [9] - 19:4, 19:7, 19:17, 20:7, 20:9, 44:12, 44:13, 44:14
**CHILDREN** [1] - 12:18
**CHIPPER** [1] - 51:15
**CHOOSES** [1] - 64:2
**CHUNKS** [1] - 58:14
**CIRCUIT** [4] - 61:22, 67:12, 69:7, 69:25
**CIRCUMSTANCES** [1] - 73:16
**CITE** [2] - 68:1, 69:24
**CITES** [1] - 63:19
**CIVIL** [1] - 1:12
**CIVIL** [1] - 2:2
**CLAIM** [2] - 26:24, 68:21, 68:23, 69:4
**CLAIMS** [15] - 60:11, 60:12, 62:4, 62:17, 63:8, 66:20, 66:22, 66:24, 67:6, 67:9, 67:10, 68:5, 68:15, 68:16, 68:19
**CLARIFICATION** [2] - 13:21, 37:23
**CLARIFY** [1] - 57:10
**CLAUDIA** [2] - 1:21, 8:15
**CLAUDIA** [1] - 8:16
**CLEANING** [2] - 39:16, 39:19
**CLEAR** [3] - 2:24, 70:10, 71:25
**CLEARLY** [1] - 66:12
**CLIENT** [1] - 59:5
**CLIENTS** [6] - 3:11, 5:5,

5:19, 5:20, 58:13, 63:16
**CLOSE** [1] - 74:22
**CLOSED** [1] - 11:12
**CLOSING** [1] - 11:14
**COLD** [1] - 40:3
**COLLEGE** [6] - 49:12, 49:13, 49:25, 50:10, 50:20, 50:22
**COMFORTABLE** [1] - 9:17
**COMMERCE** [1] - 67:2
**COMMERCIAL** [1] - 26:23
**COMPANIES** [1] - 19:13
**COMPANY** [11] - 11:16, 20:9, 25:12, 32:10, 32:17, 37:2, 39:17, 61:6, 62:23, 70:18, 74:5
**COMPENSATE** [3] - 29:25, 30:7, 53:16
**COMPENSATED** [2] - 63:17, 70:3
**COMPLAIN** [1] - 33:16
**COMPLAINED** [3] - 23:13, 23:14, 24:22
**COMPLAINING** [1] - 37:11
**COMPLAINT** [1] - 62:19
**COMPLAINT** [1] - 75:2
**COMPLETE** [4] - 19:1, 19:9, 19:15, 74:1
**COMPLETED** [2] - 19:11, 20:6
**COMPLIANCE** [3] - 61:6, 62:7, 69:13
**COMPLIANT** [2] - 62:1, 68:3
**COMPLIED** [2] - 37:10, 65:20
**COMPUTED** [2] - 34:19, 44:3
**COMPUTER** [1] - 1:25
**COMPUTER-AIDED** [1] - 1:25
**COMPUTERIZED** [1] - 1:25
**CONCERNED** [1] - 26:13
**CONCERNING** [4] - 60:15, 63:5, 70:20, 70:23
**CONCERNS** [1] - 75:19
**CONCRETE** [1] - 67:22
**CONFER** [1] - 67:23
**CONFERENCE** [1] - 6:11
**CONNECTION** [1] - 67:13
**CONSENT** [1] - 7:6
**CONSIDER** [1] - 66:24
**CONSISTENT** [1] - 73:5
**CONSTRUCTION** [1] - 19:13
**CONTACT** [1] - 7:2
**CONTAIN** [1] - 75:17
**CONTINUE** [3] - 21:20, 22:9, 42:13
**CONTINUED** [6] - 19:18, 20:1, 38:23, 39:1, 47:21, 48:1
**CONTRACTOR** [1] - 12:10
**CONTROL** [1] - 25:21

2

3

**CONVERSATIONS** [1] - 48:14
**COORDINATE** [1] - 7:14
**COPIAGUE** [3] - 1:20, 10:1, 10:3
**COPIES** [1] - 14:3
**COPY** [1] - 14:2
**CORP** [3] - 10:25, 13:17, 13:23
**CORP** [1] - 1:8
**CORPORATION** [2] - 2:4, 39:12
**CORRECT** [2] - 12:5, 12:8
**CORRECT** [26] - 3:1, 3:2, 10:25, 11:4, 11:8, 11:9, 11:25, 12:1, 12:7, 12:11, 16:21, 16:22, 19:16, 22:5, 22:6, 22:7, 22:16, 25:4, 30:5, 30:15, 52:4, 54:11, 57:15, 59:7, 75:4, 76:3
**CORRECTED** [1] - 15:18
**CORRECTIONS** [1] - 75:20
**CORRECTLY** [1] - 28:14
**CORROBORATE** [1] - 23:18
**CORROBORATING** [1] - 71:6
**COUNSEL** [13] - 2:5, 2:17, 3:3, 5:5, 36:7, 46:22, 57:9, 68:14, 73:2, 73:22, 73:23, 74:3, 74:6
**COUNSEL'S** [2] - 68:18, 75:16
**COUNT** [2] - 52:24, 53:3
**COUNTRY** [1] - 33:10
**COUPLE** [1] - 28:8
**COURSE** [3] - 46:21, 71:25, 72:10
**COURT** [29] - 1:22, 1:23, 3:5, 14:2, 14:3, 58:22, 60:21, 61:8, 62:14, 62:16, 62:17, 63:3, 63:6, 63:24, 64:1, 65:3, 66:7, 66:17, 68:14, 68:22, 71:8, 71:9, 71:25, 72:4, 73:14, 74:8, 76:8
**COURT** [193] - 1:1, 2:9, 2:11, 2:13, 2:16, 2:20, 2:24, 3:3, 3:7, 3:15, 3:18, 3:21, 3:24, 4:2, 4:5, 4:9, 4:17, 4:20, 4:23, 5:1, 5:4, 5:8, 5:13, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:21, 6:23, 7:4, 7:9, 7:11, 7:13, 7:18, 7:21, 8:1, 8:4, 8:7, 8:14, 8:17, 8:20, 9:5, 9:7, 9:12, 9:21, 10:1, 10:16, 10:18, 10:22, 12:21, 14:5, 14:7, 14:12, 14:23, 15:2, 15:11, 15:13, 15:19, 15:22, 16:5, 16:11, 20:11, 21:5, 21:7, 21:12, 21:16, 21:21, 21:23, 22:6, 22:8,

22:13, 22:16, 24:25, 25:2, 25:6, 25:8, 26:18, 27:1, 27:6, 27:18, 28:11, 29:5, 29:10, 29:15, 29:22, 30:1, 30:4, 31:1, 31:5, 31:11, 31:15, 31:18, 32:2, 34:5, 35:4, 35:8, 35:15, 35:18, 35:25, 36:5, 36:11, 37:4, 37:14, 37:18, 37:20, 38:3, 38:11, 38:14, 38:16, 38:19, 39:2, 39:7, 40:16, 40:19, 40:22, 40:25, 41:9, 41:13, 41:18, 41:23, 42:4, 42:6, 42:11, 42:13, 43:3, 43:8, 43:15, 43:19, 44:6, 44:16, 44:24, 45:4, 45:7, 45:9, 45:11, 45:16, 45:20, 45:24, 46:4, 46:13, 46:24, 47:3, 47:5, 48:10, 49:21, 52:21, 56:1, 56:3, 56:6, 56:8, 56:10, 56:13, 56:15, 56:18, 56:22, 57:15, 58:4, 58:7, 58:11, 58:18, 59:3, 59:8, 59:11, 60:7, 61:10, 61:14, 61:16, 61:18, 62:20, 63:10, 63:13, 64:3, 64:5, 64:7, 64:10, 64:18, 64:21, 64:25, 65:12, 65:16, 65:21, 65:25, 66:3, 66:14, 74:12, 74:19, 74:23, 75:5, 75:9, 75:12, 75:23
**COURT** [6] - 2:1, 58:3, 62:19, 65:5, 68:16, 68:19
**COURT'S** [2] - 7:2, 70:23
**COURTESY** [2] - 14:2, 14:3
**COURTHOUSE** [1] - 1:5
**COURTROOM** [11] - 2:2, 5:25, 6:2, 6:7, 6:10, 6:15, 7:25, 8:23, 31:24, 46:11, 47:1
**COURTS** [1] - 63:20
**CREDITS** [4] - 49:19, 50:4, 50:6, 72:5
**CRIMINAL** [3] - 28:7, 38:19, 61:5
**CROSS** [5] - 44:9, 48:12, 77:11, 77:17, 77:23
**CROSS** [2] - 27:14, 36:16
**CROSS-EXAMINATION** [2] - 48:12, 77:23
**CROSS-EXAMINE** [1] - 27:14
**CRR** [1] - 1:22, 69:2, 76:8
**CUSTOMER** [2] - 47:18, 53:2
**CUT** [3] - 35:17, 40:5, 57:17
**CUTTING** [1] - 32:15, 32:17, 57:12

**D**

**DAD** [10] - 2:25, 49:2, 51:5, 51:7, 51:13, 52:3, 52:12, 53:13, 54:7, 55:16
**DAILY** [4] - 29:24, 30:6, 30:12, 37:8
**DAMAGE** [2] - 64:11, 73:16
**DAMAGES** [11] - 64:3, 64:5, 64:24, 65:9, 67:24, 69:11, 69:14, 69:19, 69:23, 73:1, 73:6
**DANGEROUS** [1] - 28:6
**DARK** [1] - 71:2
**DARKNESS** [1] - 57:17
**DATE** [7] - 15:6, 20:13, 55:2, 73:20, 74:16, 74:19, 75:3
**DATED** [1] - 21:9
**DATES** [1] - 23:7
**DAYLIGHT** [2] - 59:21, 59:23
**DAYS** [27] - 5:14, 11:16, 18:1, 18:2, 19:14, 22:21, 23:9, 33:17, 34:10, 35:12, 35:13, 35:22, 36:1, 36:3, 39:21, 40:2, 40:4, 49:17, 51:8, 55:1, 71:1, 71:17, 72:2, 72:6, 72:15
**DE-14** [1] - 70:8
**DEAL** [1] - 69:20
**DEALS** [1] - 73:10
**DEATH** [1] - 60:23
**DECEMBER** [5] - 33:8, 35:12, 35:15, 72:13
**DECIDED** [1] - 47:18
**DECIDES** [1] - 62:16
**DECISION** [3] - 61:23, 65:14, 66:4
**DECISIONS** [1] - 63:20
**DEFAULT** [2] - 64:13, 73:25
**DEFAULTING** [1] - 70:18
**DEFENDANT** [8] - 3:22, 14:11, 14:13, 63:4, 70:5, 70:14, 70:17, 73:4
**DEFENDANT** [1] - 1:19
**DEFENDANT'S** [1] - 60:12
**DEFENDANTS** [1] - 58:12
**DEFENDANTS** [1] - 1:10
**DEFENDING** [1] - 27:2
**DEFINITELY** [2] - 54:1, 55:6
**DEGREE** [1] - 50:15
**DEMONSTRATE** [1] - 72:19
**DEMONSTRATED** [3] - 67:3, 69:10, 71:22
**DEPOSITION** [7] - 14:10, 14:20, 15:10, 15:16, 30:16, 30:23, 60:20
**DEPUTY** [7] - 2:2, 5:25, 6:2, 6:7, 6:10, 6:15, 7:25, 8:23, 31:24, 46:11, 47:1

**DESCRIBE** [1] - 52:10
**DETAIL** [1] - 3:11
**DEVISED** [1] - 72:4
**DIAL** [1] - 3:13
**DIAL-IN** [1] - 3:13
**DIARY** [1] - 71:6
**DIED** [1] - 28:4
**DIFFERENCE** [1] - 68:13
**DIFFERENT** [2] - 27:24, 50:20
**DIME** [1] - 5:13
**DIRECT** [8] - 9:13, 32:4, 39:9, 47:7, 77:5, 77:9, 77:15, 77:21
**DIRECT** [2] - 15:20, 15:22
**DIRECTLY** [2] - 6:6, 6:8
**DISCLOSURE** [1] - 46:20
**DISCOVERY** [1] - 46:21
**DISCRETIONARY** [1] - 65:4
**DISCUSSED** [2] - 2:16, 48:18
**DISCUSSING** [1] - 61:25
**DISCUSSIONS** [1] - 4:17
**DISMISS** [3] - 62:17, 68:14, 68:18
**DISMISSED** [2] - 57:24, 66:23
**DISPUTE** [1] - 67:9
**DISTRICT** [3] - 1:1, 1:1, 1:13
**DIVISION** [1] - 71:20
**DOCKET** [1] - 21:10
**DOCUMENT** [1] - 25:1
**DOCUMENT** [6] - 14:7, 14:21, 19:6, 20:7, 21:10, 71:7
**DOCUMENTARY** [1] - 67:9
**DOCUMENTS** [7] - 15:8, 20:3, 34:23, 43:20, 44:14, 51:25, 52:2
**DOLLARS** [1] - 37:1
**DONE** [10] - 21:19, 30:22, 38:12, 47:16, 61:10, 61:15, 61:17, 73:18, 75:6
**DOUBLE** [1] - 73:6
**DOUBLING** [1] - 73:16
**DOUBT** [2] - 70:2, 70:4
**DOUBTS** [1] - 70:23
**DOWN** [10] - 31:5, 37:6, 38:16, 42:6, 45:7, 56:4, 57:11, 59:4, 59:21, 59:22
**DOWNSTREAM** [1] - 67:14
**DRAFT** [1] - 75:16
**DRAFTING** [2] - 50:23, 50:24
**DRASTICALLY** [1] - 59:22
**DRAW** [3] - 15:15, 17:14, 17:19
**DRIVE** [4] - 26:1, 26:11, 26:25, 34:9
**DRIVER** [3] - 26:7, 34:7, 34:9
**DRIVER'S** [1] - 26:23

4

**DRIVING** [3] - 26:2, 28:15, 34:13
**DROP** [1] - 66:20
**DROVE** [1] - 34:11
**DRUG** [2] - 26:14, 26:24
**DRUGS** [4] - 25:20, 26:16, 28:15, 28:16
**DUE** [1] - 69:16
**DULY** [4] - 9:2, 31:22, 39:5, 46:9
**DURING** [20] - 18:2, 23:2, 25:20, 32:24, 32:25, 33:5, 33:7, 33:11, 37:11, 42:2, 43:2, 45:19, 51:9, 54:10, 54:13, 54:15, 71:17, 71:18, 71:25, 72:6

## E

**E-MAIL** [1] - 1:24
**EARNED** [2] - 55:1, 67:1
**EARNING** [1] - 48:22
**EAST** [1] - 1:16
**EASTERN** [1] - 1:1
**EASY** [2] - 44:22, 57:5
**ECF** [1] - 25:1
**EIGHT** [10] - 12:13, 29:25, 30:7, 30:9, 30:14, 33:13, 40:12, 55:12, 70:16, 72:23
**EIGHT-HOUR** [1] - 70:16
**EITHER** [3] - 20:14, 52:22, 60:21
**EL** [2] - 27:22, 28:9
**EMERGENCY** [1] - 55:4
**EMPLOYED** [5] - 13:10, 16:16, 23:7, 39:11, 53:19
**EMPLOYEE** [12] - 13:22, 16:18, 16:20, 16:21, 17:1, 17:11, 62:2, 65:6, 67:18, 67:22, 68:3, 68:24
**EMPLOYEE'S** [1] - 68:25
**EMPLOYEES** [8] - 18:8, 18:12, 18:14, 52:5, 52:8, 61:4, 61:9, 67:17
**EMPLOYER** [6] - 32:8, 60:10, 60:14, 65:8, 68:24, 69:12
**EMPLOYER'S** [1] - 63:20
**EMPLOYMENT** [3] - 33:22, 54:24, 70:18
**EMPOWER** [1] - 67:17
**END** [4] - 18:25, 26:2, 29:3, 29:20
**ENDED** [2] - 37:13, 72:3
**ENDING** [1] - 29:8
**ENGLISH** [6] - 4:21, 9:17, 11:1, 16:7, 46:13, 46:15
**ENTERPRISE** [1] - 67:1
**ENTIRE** [2] - 54:24, 74:10

**ENTIRELY** [2] - 60:3, 70:9
**ENTITLED** [1] - 76:5
**ENTITY** [1] - 74:1
**ENTRY** [1] - 21:10
**EQUAL** [2] - 69:14, 74:4
**EQUALS** [1] - 72:9
**EQUIVALENT** [2] - 66:9, 74:4
**ESPECIALLY** [1] - 36:19
**ESQ** [1] - 1:17
**ESTABLISH** [4] - 62:4, 62:15, 62:24, 68:5
**ESTABLISHED** [5] - 7:5, 22:17, 22:18, 31:2, 67:22
**ESTIMATE** [3] - 11:17, 71:10, 72:4
**ET** [2] - 2:3, 2:4
**EVIDENCE** [6] - 15:8, 62:22, 68:7, 71:6, 71:10, 72:18
**EVIDENT** [1] - 62:9
**EVIDENTIARY** [1] - 70:21
**EXACTLY** [1] - 20:21
**EXAGGERATED** [1] - 65:23
**EXAMINATION** [14] - 9:13, 32:4, 36:16, 39:9, 44:9, 47:7, 48:12, 77:5, 77:9, 77:11, 77:15, 77:17, 77:21, 77:23
**EXAMINE** [1] - 27:14
**EXAMINED** [4] - 9:3, 31:23, 39:6, 46:10
**EXAMPLE** [3] - 28:18, 61:24, 68:2
**EXCEED** [1] - 63:25
**EXCELLENT** [1] - 31:18
**EXCEPT** [1] - 56:17
**EXCESS** [1] - 69:6
**EXCUSE** [5] - 6:18, 64:4, 74:18
**EXERCISE** [1] - 63:7
**EXHIBITS** [1] - 14:1
**EXISTS** [3] - 11:4, 25:12, 68:22
**EXPECTED** [1] - 21:1
**EXPLAIN** [4] - 42:23, 66:10, 66:19, 75:15
**EXPLAINING** [1] - 44:2
**EXPLAINS** [1] - 43:7
**EXTANT** [1] - 74:2
**EXTENDING** [1] - 72:2
**EXTENSION** [1] - 71:21
**EXTENT** [3] - 5:21, 63:6, 71:21
**EXTRA** [26] - 23:11, 23:16, 23:22, 23:23, 23:24, 24:17, 24:19, 24:20, 33:20, 34:12, 37:12, 37:16, 37:21, 38:9, 42:19, 47:13, 49:2, 52:3, 53:2, 53:3, 53:13, 55:16, 55:19, 60:11, 60:14, 72:8
**EYES** [1] - 44:19

## F

**F.3D** [1] - 69:24
**FACE** [3] - 28:1, 28:3
**FACT** [2] - 26:22, 26:23, 67:23
**FACTS** [2] - 27:12, 70:1
**FACTUAL** [1] - 67:8
**FAILED** [1] - 70:18
**FAILURE** [1] - 61:1
**FAIR** [1] - 69:1
**FAIR** [4] - 16:15, 17:7, 20:19, 65:19
**FAITH** [2] - 65:8, 69:12
**FAR** [1] - 29:19
**FARMINGDALE** [6] - 49:14, 49:15, 50:2, 50:16, 50:19, 51:3
**FASCINATING** [1] - 68:15
**FASHION** [2] - 62:3, 68:4
**FASTER** [1] - 5:18
**FATHER** [2] - 48:15, 48:19
**FAVOR** [1] - 19:5
**FEASIBLE** [1] - 60:3
**FEBRUARY** [4] - 14:20, 35:13, 35:21, 72:14
**FEDERAL** [3] - 3:12, 66:9, 73:3
**FEES** [4] - 65:7, 69:20, 73:24, 75:7
**FELT** [1] - 25:21
**FEW** [1] - 61:19
**FIGHT** [1] - 75:1
**FIGURE** [3] - 5:25, 57:20, 74:20
**FILE** [1] - 62:18
**FILED** [1] - 21:10
**FILING** [2] - 68:19, 75:2
**FINE** [2] - 6:14, 75:22
**FINISH** [1] - 43:19
**FINISHED** [2] - 55:14, 70:12
**FIRE** [2] - 18:8, 18:12
**FIRED** [3] - 25:15, 25:19, 33:2
**FIRM** [1] - 1:15
**FIRST** [15] - 3:9, 3:21, 3:23, 8:8, 9:2, 31:22, 32:21, 33:6, 33:25, 39:5, 42:3, 46:9, 48:25, 57:9, 61:20
**FIVE** [10] - 10:12, 16:19, 36:1, 36:3, 37:1, 40:1, 70:25, 71:16
**FIX** [1] - 71:8
**FLOOR** [1] - 53:7
**FLSA** [3] - 62:24, 66:18, 66:25
**FOCUSED** [1] - 27:3
**FOCUSING** [1] - 28:14
**FOLDER** [1] - 14:1

**FOLEY** [2] - 1:22, 76:8
**FOLLOW** [3] - 29:22, 38:14, 46:17
**FOLLOWING** [1] - 19:18
**FOLLOWS** [4] - 9:3, 31:23, 39:6, 46:10
**FOOD** [3] - 24:7, 24:8
**FOR** [1] - 1:12
**FORE** [1] - 73:7
**FOREGOING** [1] - 76:3
**FORGIVE** [1] - 57:9
**FORM** [1] - 11:10
**FORMED** [1] - 11:5
**FORMER** [2] - 32:8, 46:21
**FORTH** [3] - 4:12, 28:25, 36:9
**FORTUNATELY** [1] - 71:8
**FORWARD** [1] - 5:12
**FOUR** [8] - 14:1, 23:25, 53:14, 55:20, 55:23, 72:21, 72:22
**FREE** [6] - 36:11, 43:16, 45:11, 51:7, 59:25, 74:5
**FRIEND'S** [1] - 27:21
**FRIENDS** [2] - 27:25, 52:14
**FRONT** [6] - 47:13, 48:4, 52:9, 52:24, 53:3, 63:19
**FULL** [9] - 42:8, 42:9, 49:15, 49:17, 50:6, 50:8, 62:2, 65:6, 68:4
**FULL-TIME** [6] - 42:8, 42:9, 49:15, 49:17, 50:6, 50:8

## G

**GALLERY** [1] - 38:21
**GARY** [1] - 1:12
**GATHERINGS** [1] - 28:5
**GENERAL** [1] - 12:10
**GENTLEMEN** [1] - 13:2
**GIVEN** [4] - 24:5, 43:23, 62:5, 69:5
**GLASSES** [2] - 14:22, 15:3
**GOD** [2] - 38:8
**GOTCHA** [1] - 12:23
**GRADUATE** [1] - 50:12
**GRAND** [1] - 64:16
**GRB** [1] - 1:3
**GREAT** [2] - 3:8, 8:17
**GREATLY** [1] - 72:1
**GROUP** [1] - 69:24
**GUESS** [2] - 52:14, 74:12
**GUESSING** [2] - 54:5, 54:6
**GUN** [1] - 27:25
**GUTHRIE** [5] - 61:24, 62:8, 67:15, 67:25, 68:6
**GUY** [1] - 25:22

## H

**HALF** [5] - 29:11, 29:16, 30:9, 68:25, 70:7
**HALF-HOUR** [1] - 70:7
**HAND** [4] - 8:23, 32:20, 52:12, 52:17
**HANDED** [1] - 52:19
**HANG** [2] - 8:10, 46:1
**HAPPY** [2] - 24:21, 63:25
**HARD** [3] - 27:3, 43:8, 66:15
**HARM** [2] - 67:14, 67:20
**HEAD** [1] - 48:20
**HEALTH** [1] - 69:8
**HEAR** [9] - 3:7, 8:1, 8:3, 8:6, 9:10, 15:1, 27:13, 57:2, 66:12
**HECTOR** [3] - 1:3, 39:4, 77:14
**HECTOR** [41] - 13:5, 13:11, 13:15, 13:16, 13:21, 16:15, 17:4, 17:5, 17:6, 17:8, 17:9, 17:10, 17:12, 17:23, 18:6, 18:19, 18:23, 20:2, 20:6, 20:14, 23:5, 23:8, 24:13, 24:16, 25:10, 25:15, 27:20, 27:22, 28:9, 29:24, 30:2, 39:3, 39:11, 44:11, 53:19, 54:18, 55:22, 60:21
**HELD** [1] - 63:20
**HELLO** [1] - 8:6
**HELP** [8] - 2:25, 3:18, 4:4, 16:6, 32:21, 37:21, 51:14, 75:12
**HELPER** [1] - 43:1
**HELPFUL** [2] - 28:12, 28:20
**HELPS** [1] - 46:4
**HENCE** [2] - 70:19, 72:15
**HERNANDEZ** [3] - 1:3, 39:4, 77:14
**HERNANDEZ** [17] - 13:5, 13:15, 13:21, 16:16, 17:6, 17:23, 18:19, 18:23, 25:10, 38:8, 39:3, 53:19, 54:18, 55:22, 55:23, 60:22, 73:17
**HERNANDEZ'S** [2] - 23:5, 73:9
**HESITATE** [1] - 4:24
**HI** [1] - 2:10
**HIGH** [3] - 47:10, 49:11, 51:6
**HIRE** [5] - 17:4, 17:21, 17:23, 18:8, 18:12
**HIRED** [11] - 17:8, 17:9, 17:10, 19:1, 19:9, 19:15, 20:2, 20:14, 20:20, 34:22, 43:21
**HIRING** [1] - 57:6
**HOLD** [5] - 10:16, 10:18, 21:16, 44:24, 59:11

**HOME** [6] - 10:7, 10:9, 10:11, 10:13, 13:19, 52:9
**HONED** [1] - 58:22
**HONEST** [2] - 34:4, 34:5
**HONESTLY** [5] - 50:7, 53:20, 53:22, 54:2, 55:21
**HONOR** [18] - 2:8, 5:7, 6:17, 6:20, 7:8, 13:25, 15:24, 16:9, 21:4, 24:23, 27:4, 31:13, 43:18, 45:6, 46:18, 58:10, 63:19, 66:11
**HONORABLE** [1] - 1:12
**HOUR** [14] - 22:25, 23:11, 29:11, 29:12, 29:16, 29:17, 56:19, 57:19, 70:7, 70:8, 70:16, 71:19, 71:23, 72:6
**HOURLY** [2] - 71:14, 71:19
**HOURS** [34] - 22:21, 23:6, 23:16, 25:20, 29:25, 30:7, 30:9, 30:14, 33:11, 33:13, 33:14, 34:18, 36:8, 36:19, 37:12, 40:13, 47:14, 55:10, 55:12, 58:22, 59:24, 60:16, 63:22, 66:22, 69:5, 69:7, 70:3, 70:12, 70:19, 71:8, 71:20, 71:22, 72:1, 72:8
**HOUSE** [6] - 10:14, 28:5, 48:6, 52:11, 53:8, 54:13
**HOUSEKEEPING** [1] - 3:10
**HOUSES** [1] - 55:5
**HUMAN** [1] - 57:16
**HUNTINGTON** [1] - 1:16
**HURRICANE** [2] - 55:3, 55:11

## I

**I-9** [1] - 19:15
**ID** [1] - 19:6
**IDEA** [1] - 55:24
**IDENTIFIED** [4] - 46:20, 46:21, 46:22
**IDENTIFIES** [1] - 14:1
**IMMEDIATELY** [1] - 66:21
**IMPLEMENT** [1] - 61:24
**IMPORTANT** [2] - 66:10, 66:19
**IMPORTANTLY** [1] - 71:5
**IMPROPERLY** [1] - 68:10
**INACCURATE** [2] - 62:1, 68:2
**INASMUCH** [1] - 63:14
**INCLUDE** [4] - 53:17, 64:21, 74:3, 74:23
**INCLUDED** [2] - 18:17, 18:19
**INCLUDES** [1] - 64:23
**INCLUDING** [2] - 55:18, 56:22
**INCOME** [3] - 62:23, 63:6,

67:2
**INDICATIVE** [1] - 63:22
**INDIVIDUALS** [2] - 60:4, 60:11
**INDUSTRY** [1] - 60:23
**INFORMATION** [4] - 3:13, 7:3, 28:21, 59:19
**INJURY** [2] - 60:24, 67:22
**INSANE** [1] - 3:15
**INSIDE** [1] - 26:16
**INSTANCE** [2] - 52:7, 59:10
**INSTANCES** [1] - 55:5
**INSTEAD** [1] - 6:9
**INSTITUTE** [1] - 50:23
**INTENDED** [4] - 29:25, 30:7, 67:17, 71:14
**INTENTION** [4] - 17:12, 19:3, 19:4
**INTEREST** [12] - 64:22, 64:23, 65:1, 65:3, 65:7, 65:11, 69:21, 69:22, 73:19, 74:15, 74:24, 75:18
**INTERESTED** [1] - 43:5
**INTERESTING** [2] - 46:24, 62:20
**INTERJECT** [1] - 66:5
**INTERPRET** [5] - 4:11, 36:13, 46:16, 58:14
**INTERPRETER** [12] - 8:3, 8:6, 8:13, 8:15, 14:25, 15:4, 31:17, 37:22, 57:23, 58:9, 59:14, 66:11
**INTERPRETER** [33] - 3:11, 3:12, 3:24, 4:1, 4:3, 4:6, 4:10, 4:12, 4:20, 5:5, 5:16, 6:24, 6:25, 7:5, 7:20, 7:24, 8:10, 8:12, 9:10, 9:15, 9:16, 10:2, 11:3, 14:25, 31:15, 36:12, 37:22, 57:21, 57:23, 58:8, 58:9, 66:5
**INTERPRETER** [1] - 1:21
**INTERPRETER'S** [1] - 75:12
**INTERPRETING** [1] - 57:22
**INTERSTATE** [1] - 67:1
**INVECTIVE** [1] - 61:10
**INVERTED** [1] - 73:4
**INVITATION** [1] - 68:18
**INVITE** [1] - 52:13
**INVITES** [1] - 68:14
**INVITING** [1] - 28:5
**IRENE** [2] - 55:3, 55:11
**IRONICALLY** [1] - 67:8
**ISLAND** [1] - 50:23
**ISLAND** [2] - 12:20, 50:24
**ISLIP** [1] - 1:5
**ISSUE** [7] - 56:25, 57:7, 57:11, 57:17, 58:20, 67:11, 72:15
**ISSUES** [1] - 67:8

## J

**JANUARY** [3] - 35:13, 35:16, 35:21
**JOB** [13] - 13:8, 13:12, 13:13, 18:2, 19:12, 25:14, 25:25, 37:12, 49:7, 49:8, 51:14, 62:7, 75:24
**JOBS** [2] - 55:4, 68:10
**JONATHAN** [3] - 1:3, 31:21, 77:8
**JONATHAN** [31] - 13:5, 17:1, 17:8, 17:11, 17:21, 18:6, 18:17, 19:1, 19:4, 19:10, 19:15, 20:14, 20:20, 23:19, 24:9, 25:17, 25:19, 26:1, 26:10, 27:24, 28:22, 30:6, 31:9, 31:20, 36:18, 53:24, 54:22, 55:19, 55:20, 60:22
**JONATHAN'S** [1] - 26:14
**JORGE** [2] - 32:22, 52:12
**JUDGE** [1] - 57:24
**JUDGE** [1] - 1:13
**JUDGMENT** [10] - 62:18, 64:13, 73:7, 73:16, 74:1, 74:4, 74:10, 74:14, 75:18
**JULY** [1] - 21:11
**JUNE** [3] - 33:1, 49:9, 72:20
**JURISDICTION** [1] - 63:7
**JURY** [1] - 3:6

## K

**K-E-V-I-N** [1] - 47:4
**KAREN** [4] - 3:18, 4:7, 5:24, 7:15
**KEEP** [6] - 9:9, 12:24, 27:3, 36:8, 42:16, 42:21
**KEEPING** [1] - 59:23
**KEPT** [2] - 62:11, 68:10
**KEVIN** [2] - 46:8, 77:20
**KEVIN** [3] - 2:23, 47:9, 57:10
**KILLED** [4] - 27:22, 27:25, 28:2, 28:10
**KILLING** [1] - 28:16
**KIND** [8] - 19:6, 20:7, 20:23, 25:20, 32:20, 40:2, 51:12, 56:25
**KNOWN** [2] - 10:24, 11:24
**KNOWS** [5] - 38:9, 45:18, 45:21, 46:2, 66:6

## L

**LABOR** [2] - 61:5, 63:1
**LABOR** [12] - 63:7, 63:9, 63:15, 66:8, 66:18, 67:5, 67:7, 68:23, 69:1, 69:9,

69:17
**LACK** [1] - 67:13
**LAFAYETTE** [4] - 1:19, 9:24, 10:3, 22:1
**LANDSCAPE** [1] - 1:8
**LANDSCAPE** [2] - 2:4, 13:23
**LANDSCAPING** [4] - 10:25, 11:7, 13:17, 39:12
**LANDSCAPING** [2] - 11:17, 43:1
**LANGUAGE** [1] - 46:13
**LARGE** [1] - 26:3
**LAST** [8] - 7:19, 8:16, 25:24, 47:4, 66:12, 72:23, 72:24
**LATE** [5] - 30:10, 36:19, 37:8, 47:14
**LAW** [1] - 1:15
**LAW** [11] - 26:8, 62:7, 63:1, 63:17, 69:14, 70:20, 71:9, 73:3, 73:4, 73:5, 73:15
**LAW** [11] - 63:7, 63:9, 63:15, 66:8, 66:18, 67:5, 67:7, 68:23, 69:9, 69:17
**LAWS** [1] - 61:5
**LAWSUIT** [2] - 61:1, 61:4
**LAYING** [1] - 73:22
**LEAST** [3] - 7:5, 16:25, 20:7
**LEAVE** [2] - 47:18, 73:21
**LEAVES** [5] - 31:7, 38:18, 45:8, 56:7, 67:4
**LEFT** [4] - 13:2, 25:14, 25:25
**LEGAL** [1] - 67:11
**LEGISLATURE** [1] - 67:16
**LEND** [1] - 37:24
**LESS** [4] - 59:1, 59:3, 66:9, 66:19
**LETTER** [1] - 63:24
**LICENSE** [2] - 12:16, 26:23
**LICENSED** [1] - 12:9
**LICITLY** [1] - 60:19
**LIES** [1] - 46:5
**LIEU** [1] - 62:18
**LIFE** [2] - 48:25, 54:21
**LIMBS** [3] - 57:15, 57:16
**LIMIT** [1] - 64:19
**LINE** [7] - 5:24, 6:4, 6:5, 14:10, 31:16, 57:24, 58:8
**LINED** [1] - 7:1
**LINES** [3] - 15:16, 16:2, 17:19
**LIQUIDATED** [7] - 62:21, 64:24, 65:9, 69:11, 69:14, 69:19, 69:23
**LITIGATION** [1] - 62:13
**LIVE** [3] - 9:23, 12:15, 12:17
**LIVING** [1] - 10:21
**LOOK** [6] - 21:19, 44:19, 53:1, 59:16, 74:25, 75:19
**LOOKED** [2] - 22:1, 58:24

**LOOKING** [5] - 19:12, 25:1, 27:23, 44:21, 63:14
**LOUD** [1] - 8:5
**LUCKILY** [1] - 58:23
**LUNCH** [4] - 53:17, 53:18, 55:18, 56:18
**LUNCHEON** [1] - 58:1
**LUNDY** [1] - 69:8
**LYING** [4] - 38:7, 38:8, 44:17

## M

**MAIL** [1] - 1:24
**MAIN** [1] - 1:16
**MAINTAIN** [1] - 70:18
**MAINTAINED** [1] - 18:2
**MAINTENANCE** [1] - 51:10
**MALDONADO** [6] - 17:11, 23:13, 23:17, 28:7, 32:23, 52:12
**MAN** [3] - 23:11, 27:2, 28:2
**MANAGER** [1] - 32:21
**MANDATORY** [1] - 65:11
**MANIPULATE** [1] - 36:25
**MANNER** [1] - 69:1
**MARCH** [13] - 32:25, 33:6, 35:11, 40:1, 42:6, 42:12, 57:12, 59:10, 59:16, 60:3, 71:17, 72:6, 72:19
**MARIE** [2] - 1:22, 76:8
**MARIE_FOLEY@NYED. USCOURTS.GOV** [1] - 1:24
**MARIJUANA** [1] - 26:17
**MARKETS** [1] - 69:24
**MATCHED** [1] - 38:1
**MATTER** [5] - 28:17, 38:19, 66:8, 73:12, 76:5
**MATTERS** [3] - 63:10, 71:15, 75:1
**MEAN** [11] - 8:1, 16:21, 17:6, 25:12, 35:20, 35:23, 42:23, 43:4, 43:25, 72:16, 74:20
**MEANING** [6] - 67:2, 67:9, 71:19, 71:23, 72:6, 72:13
**MEANS** [5] - 43:3, 68:21, 71:18, 72:20, 73:7
**MEASURE** [1] - 71:14
**MEDIUM** [1] - 26:4
**MEET** [1] - 57:19
**MEN** [1] - 58:21
**MENTIONED** [2] - 29:20, 52:3
**MERITED** [1] - 68:20
**MESSAGE** [1] - 7:23
**MET** [1] - 62:24
**METHODS** [1] - 69:1
**MICROPHONE** [2] - 9:9, 44:7
**MID** [1] - 33:8
**MIDDLE** [2] - 32:25, 33:7

**MIGHT** [1] - 68:16
**MILLIMETER** [1] - 27:23
**MIND** [3] - 22:8, 59:23, 70:23
**MINIMUM** [3] - 43:5, 66:22, 67:2
**MINUTE** [4] - 4:7, 5:1, 14:23, 40:16
**MINUTES** [2] - 31:11, 64:9
**MOMENT** [5] - 11:15, 20:16, 23:17, 24:5, 27:6
**MOMENTARILY** [2] - 66:10, 66:19
**MONEY** [20] - 23:15, 23:20, 23:23, 23:24, 34:10, 36:21, 36:22, 36:23, 37:3, 37:16, 37:21, 37:24, 38:1, 38:2, 44:22, 45:1, 52:24, 53:3, 67:1
**MONTH** [9] - 13:14, 41:9, 41:13, 41:25, 42:3, 42:8, 42:11, 43:12
**MONTHS** [12] - 35:5, 35:19, 35:21, 35:24, 39:25, 40:4, 49:5, 58:25, 59:17, 59:18, 60:2, 72:24
**MOOD** [1] - 47:19
**MORNING** [4] - 2:8, 2:9, 6:25, 33:14
**MOSER** [1] - 27:2
**MOSER** [11] - 2:7, 7:18, 8:8, 26:19, 27:1, 27:14, 28:15, 58:4, 58:11, 62:22, 66:1
**MOSER** [121] - 1:15, 1:17, 2:7, 3:5, 3:10, 3:17, 3:20, 3:22, 3:25, 5:6, 5:11, 5:17, 5:20, 6:5, 6:13, 6:17, 6:20, 6:22, 6:24, 7:8, 7:10, 7:19, 7:23, 8:19, 9:14, 10:17, 10:19, 12:23, 13:1, 13:25, 14:6, 14:9, 14:14, 14:14, 14:16, 14:18, 15:5, 15:12, 15:14, 15:21, 15:24, 16:1, 16:9, 16:13, 16:18, 20:12, 21:2, 21:6, 21:9, 21:13, 21:20, 21:22, 22:5, 22:7, 22:11, 22:14, 24:23, 25:1, 25:9, 26:20, 26:21, 27:4, 29:23, 30:3, 31:3, 31:9, 31:13, 31:20, 32:5, 35:2, 36:10, 36:15, 36:17, 38:6, 38:13, 38:15, 39:3, 39:10, 41:4, 42:14, 42:17, 43:7, 43:10, 43:14, 43:18, 44:5, 44:10, 44:23, 45:5, 45:6, 45:10, 45:15, 45:18, 45:23, 46:2, 46:18, 47:8, 48:2, 48:8, 48:13, 49:24, 51:2, 52:23, 55:25, 56:2, 56:9, 56:12, 56:14, 56:17, 56:21, 57:14, 58:6, 58:17, 58:20, 59:7, 59:9, 59:13, 59:16, 60:9, 61:13, 61:15, 61:17, 62:9, 63:3, 63:12, 63:14, 64:4, 64:6, 64:8, 64:11, 64:16, 64:20, 64:23, 65:5, 65:15, 65:18, 65:22, 66:2, 74:9, 74:18, 74:21, 75:4, 75:8, 75:11, 75:22, 77:6, 77:10, 77:12, 77:16, 77:18, 77:22, 77:24
**MULCH** [1] - 51:15
**MULTIPLE** [1] - 61:5
**MULTIPLYING** [1] - 72:8
**MUST** [2] - 67:12, 69:5

74:21, 75:4, 75:8, 77:6, 77:10, 77:16, 77:24
**MOST** [3] - 24:9, 24:13, 59:10
**MOTION** [2] - 62:18, 64:12
**MOVE** [8] - 5:12, 5:18, 15:12, 15:13, 22:17, 26:19, 26:20, 43:8
**MR** [160] - 2:7, 2:10, 2:12, 2:15, 2:19, 2:23, 3:2, 3:5, 3:10, 3:17, 3:20, 3:22, 3:25, 4:4, 4:16, 4:19, 4:22, 4:25, 5:6, 5:11, 5:17, 5:20, 6:5, 6:13, 6:17, 6:20, 6:22, 6:24, 7:8, 7:10, 7:19, 7:23, 8:19, 9:14, 10:17, 10:19, 12:23, 13:1, 13:25, 14:6, 14:9, 14:14, 14:16, 14:18, 15:5, 15:12, 15:14, 15:21, 15:24, 16:1, 16:9, 16:13, 17:18, 20:12, 21:2, 21:6, 21:9, 21:13, 21:20, 21:22, 22:5, 22:7, 22:11, 22:14, 24:23, 25:1, 25:9, 26:20, 26:21, 27:4, 29:23, 30:3, 31:3, 31:9, 31:13, 31:20, 32:5, 35:2, 36:10, 36:15, 36:17, 38:6, 38:13, 38:15, 39:3, 39:10, 41:4, 42:14, 42:17, 43:7, 43:10, 43:14, 43:18, 44:5, 44:10, 44:23, 45:5, 45:6, 45:10, 45:15, 45:18, 45:23, 46:2, 46:18, 47:8, 48:2, 48:8, 48:13, 49:24, 51:2, 52:23, 55:25, 56:2, 56:9, 56:12, 56:14, 56:17, 56:21, 57:14, 58:6, 58:17, 58:20, 59:7, 59:9, 59:13, 59:16, 60:9, 61:13, 61:15, 61:17, 62:9, 63:3, 63:12, 63:14, 64:4, 64:6, 64:8, 64:11, 64:16, 64:20, 64:23, 65:5, 65:15, 65:18, 65:22, 66:2, 74:9, 74:18, 74:21, 75:4, 75:8, 75:11, 75:22, 77:6, 77:10, 77:12, 77:16, 77:18, 77:22, 77:24
**MULCH** [1] - 51:15
**MULTIPLE** [1] - 61:5
**MULTIPLYING** [1] - 72:8
**MUST** [2] - 67:12, 69:5

## N

**N-I-E-T-O** [1] - 47:4
**NAME** [15] - 2:11, 2:12, 2:22, 2:23, 8:14, 8:15, 8:16, 31:25, 46:12, 47:2, 47:3, 47:4, 55:1, 57:9
**NATIONAL** [2] - 58:23, 59:19

6

**7**

**NATWEST** [1] - 69:24
**NEAR** [1] - 9:9
**NECESSARY** [3] - 5:17, 57:22, 62:12
**NEED** [19] - 3:5, 3:7, 3:11, 4:2, 5:5, 5:11, 14:5, 14:22, 28:12, 28:17, 38:20, 41:23, 42:22, 42:23, 42:24, 62:9, 64:9, 74:7, 75:12
**NEEDED** [5] - 4:24, 30:21, 38:1, 62:7, 68:10
**NEEDS** [6] - 3:25, 5:9, 7:5, 10:19, 15:18, 37:22
**NEVER** [30] - 17:8, 17:9, 19:11, 19:17, 20:6, 22:8, 23:13, 23:14, 24:7, 24:21, 25:15, 25:19, 34:20, 35:1, 36:19, 37:9, 37:17, 37:18, 37:19, 42:20, 44:4, 44:15, 45:3, 46:19, 46:20, 46:21, 46:22, 48:18, 51:23
**NEVERTHELESS** [1] - 74:2
**NEW** [3] - 55:24, 61:9, 61:23
**NEW** [1] - 1:1
**NEW** [20] - 1:5, 1:16, 1:20, 9:24, 10:3, 60:20, 62:25, 63:7, 63:8, 63:14, 66:8, 66:17, 67:5, 67:6, 68:22, 68:23, 69:2, 69:9, 69:16, 73:15
**NEXT** [11] - 7:14, 7:23, 31:8, 31:19, 38:23, 39:2, 45:9, 47:21, 56:20, 57:19, 75:16
**NICEST** [1] - 7:13
**NIETO** [35] - 2:12, 2:14, 2:23, 2:24, 4:2, 4:9, 5:8, 7:4, 8:18, 8:19, 8:20, 9:12, 9:15, 9:23, 14:19, 21:18, 21:19, 32:8, 32:10, 33:16, 36:6, 36:11, 37:14, 43:16, 47:6, 48:14, 57:22, 60:18, 60:25, 62:10, 63:15, 65:12, 70:5, 75:10, 75:13
**NIETO** [47] - 1:8, 1:19, 2:10, 2:12, 2:15, 2:19, 2:23, 3:2, 4:4, 4:16, 4:19, 4:22, 4:25, 9:1, 21:20, 21:22, 22:5, 22:7, 36:10, 36:15, 36:17, 38:6, 38:13, 44:10, 44:23, 45:5, 45:15, 45:18, 46:2, 46:8, 47:8, 48:2, 48:8, 56:2, 56:12, 56:14, 57:14, 65:15, 65:18, 65:22, 75:11, 75:22, 77:3, 77:12, 77:18, 77:20, 77:22
**NIGHT** [3] - 33:15, 37:15, 57:12
**NINE** [1] - 27:23
**NINE-MILLIMETER** [1] - 27:23

**NON** [2] - 62:1, 68:3
**NON-COMPLIANT** [2] - 62:1, 68:3
**NONE** [3] - 34:24, 38:15, 62:12
**NORMAL** [3] - 24:11, 33:9, 37:11
**NORMALLY** [1] - 27:8
**NOTE** [2] - 60:18, 73:25
**NOTED** [1] - 75:25
**NOTHING** [2] - 16:19, 45:6
**NOTICE** [7] - 34:22, 60:25, 61:3, 61:21, 67:6, 67:10, 68:12
**NOTICES** [5] - 57:6, 62:1, 67:13, 67:21, 68:3
**NOVEMBER** [10] - 33:7, 35:11, 40:1, 41:11, 41:12, 43:13, 59:2, 59:22, 71:18, 72:7
**NUMBER** [4] - 6:12, 21:10, 51:19, 71:8
**NUMBERS** [2] - 29:15, 72:5
**NYLL** [4] - 69:4, 69:11, 69:18, 69:22

---

## O

**O'CLOCK** [12] - 23:19, 24:16, 30:18, 30:19, 30:25, 40:8, 42:18, 53:15, 55:15, 57:12, 59:4, 59:5
**OATH** [2] - 9:9, 46:5
**OBJECTED** [1] - 57:9
**OBJECTION** [4] - 20:11, 45:23, 45:24, 46:19
**OBTAIN** [2] - 20:24, 50:15
**OBTAINED** [1] - 67:20
**OBTAINING** [2] - 62:2, 68:4
**OBVIOUSLY** [6] - 55:4, 58:12, 70:13, 70:15, 72:1, 72:3
**OCCASION** [2] - 27:20, 29:8
**OCCASIONALLY** [2] - 40:25, 73:11
**OCCASIONS** [2] - 26:16, 29:8
**OCTOBER** [4] - 11:13, 59:1, 59:20, 60:3
**OF** [3] - 1:1, 1:12, 76:1
**OFF-SEASON** [1] - 71:2
**OFFERED** [2] - 44:11, 71:5
**OFFICIAL** [1] - 76:8
**OFFICIAL** [2] - 1:23, 51:22
**OFTEN** [2] - 40:19, 53:14
**ONCE** [8] - 16:25, 20:4, 20:25, 27:21, 27:22, 53:22, 54:21, 75:6
**ONE** [36] - 3:7, 3:10, 4:7,

7:13, 13:14, 13:20, 14:5, 18:20, 19:14, 23:9, 26:25, 27:6, 27:20, 29:8, 30:13, 32:22, 35:22, 41:16, 41:19, 41:20, 41:25, 42:7, 43:19, 49:21, 57:4, 59:17, 61:20, 64:19, 68:25, 71:1, 72:14, 73:12, 73:13, 75:15
**ONE-HALF** [1] - 68:25
**ONLINE** [1] - 9:15
**OPEN** [3] - 2:1, 58:3, 73:21
**OPENED** [2] - 11:24, 12:6, 61:6
**OPENING** [2] - 3:4, 3:6
**OPERATE** [1] - 11:18
**OPERATED** [1] - 60:18
**OPERATING** [1] - 12:13
**OPPORTUNITY** [2] - 3:8, 37:3
**OPPOSITE** [1] - 68:7
**ORDER** [12] - 13:25, 16:4, 16:10, 19:7, 20:7, 42:25, 73:21, 74:3, 74:7, 74:13, 74:21, 75:16
**ORGANIZED** [1] - 16:3
**OUTCOME** [1] - 49:3
**OUTSIDE** [1] - 6:17
**OVERTIME** [29] - 29:11, 30:11, 30:17, 30:18, 30:24, 34:25, 38:10, 43:5, 44:18, 56:25, 57:8, 57:18, 67:5, 68:23, 68:24, 70:3, 70:6, 70:14, 70:15, 71:4, 71:22, 71:23, 72:7, 72:8, 72:9, 72:10, 72:15, 73:1, 73:13
**OWED** [3] - 36:23, 71:22, 71:23
**OWN** [3] - 11:20, 23:5, 52:9
**OWNER** [3] - 10:24, 12:2, 18:3

---

## P

**P.C** [1] - 1:15
**P.M** [15] - 23:19, 24:16, 29:12, 30:18, 30:19, 30:25, 42:18, 59:18, 59:20, 59:22, 60:4, 70:7, 70:8, 70:12, 75:25
**PAGE** [10] - 15:15, 16:2, 16:12, 17:14, 17:16, 17:19, 19:18, 38:23, 47:21
**PAGE** [1] - 77:1
**PAGES** [3] - 16:3, 63:25
**PAID** [56] - 19:17, 21:1, 22:23, 23:7, 23:15, 23:16, 24:7, 24:9, 24:12, 24:13, 28:23, 28:24, 29:3, 29:10, 29:24, 30:6, 30:12, 30:18,

33:20, 34:1, 34:15, 34:16, 34:17, 35:1, 36:18, 36:20, 37:7, 40:10, 44:17, 44:19, 46:3, 47:12, 47:13, 47:17, 48:4, 49:2, 52:3, 52:5, 52:8, 52:16, 53:11, 54:11, 55:6, 55:8, 60:11, 60:14, 60:16, 61:9, 62:6, 65:24, 68:9, 70:6, 70:15, 71:16
**PANDEMIC** [1] - 54:4
**PAPER** [1] - 67:9
**PAPERWORK** [5] - 19:2, 19:9, 19:16, 20:3, 44:15
**PARADISE** [48] - 2:3, 10:24, 11:5, 11:6, 11:7, 11:10, 11:14, 11:25, 12:12, 13:10, 13:17, 13:22, 16:16, 16:21, 17:2, 18:3, 18:9, 18:12, 18:15, 25:11, 25:13, 25:18, 32:12, 32:13, 32:16, 32:19, 32:24, 33:3, 33:5, 33:12, 33:23, 33:25, 34:23, 39:12, 39:20, 41:5, 43:2, 43:11, 43:21, 51:21, 52:1, 53:19, 53:25, 54:3, 54:18, 54:22, 63:4, 63:5
**PARADISE** [1] - 1:7
**PART** [4] - 35:10, 66:12, 66:13, 66:18
**PARTY** [1] - 2:25
**PASSAGE** [1] - 7:19
**PAST** [9] - 2:16, 4:18, 37:15, 42:18, 48:17, 55:15, 59:5, 70:7, 70:8
**PAUSE** [3] - 58:14, 67:11, 71:3
**PAUSE** [15] - 4:8, 5:3, 6:16, 6:19, 7:12, 7:17, 7:22, 9:25, 14:15, 14:17, 14:24, 15:25, 16:8, 17:17, 64:15
**PAY** [54] - 5:14, 17:13, 18:20, 18:23, 19:4, 19:5, 22:24, 23:1, 23:10, 23:11, 23:20, 23:21, 23:23, 23:24, 24:1, 24:2, 24:4, 24:7, 24:16, 24:21, 26:12, 28:14, 29:9, 29:24, 30:10, 30:17, 30:24, 33:22, 34:25, 36:8, 36:24, 36:25, 37:10, 38:9, 40:12, 42:19, 42:25, 43:23, 44:12, 44:13, 45:1, 45:21, 47:17, 48:4, 53:13, 54:18, 54:22, 55:16, 55:19, 55:22, 65:23, 66:22, 68:23, 68:24
**PAYCHECK** [1] - 51:23
**PAYING** [9] - 18:14, 18:24, 36:19, 37:10, 47:16, 61:4, 63:21, 70:14, 73:5
**PAYMENT** [5] - 19:8, 23:12, 44:1, 62:2, 68:4

8

**PAYMENTS** [2] - 28:13, 65:20
**PAYROLL** [1] - 21:25
**PENALTY** [1] - 57:6
**PENNSYLVANIA** [7] - 10:14, 11:22, 12:7, 12:9, 12:15, 12:16, 61:7
**PEOPLE** [4] - 28:7, 28:16, 37:13, 63:21
**PER** [22] - 11:16, 13:14, 24:1, 28:25, 29:6, 29:11, 29:12, 34:2, 35:22, 40:10, 52:25, 54:19, 54:22, 70:7, 71:16, 71:17, 72:9, 72:10, 72:11, 72:12, 72:15, 72:22
**PERCENT** [1] - 69:15
**PERHAPS** [5] - 3:14, 13:14, 13:18, 25:22, 29:8
**PERIOD** [2] - 32:24, 73:11
**PERIODS** [2] - 71:18, 73:12
**PERMITS** [1] - 69:9
**PERSISTENT** [1] - 26:24
**PERSON** [5] - 25:20, 27:22, 27:25, 32:21, 47:12
**PERSONAL** [1] - 71:6
**PHONE** [7] - 3:12, 3:14, 3:16, 4:6, 4:10, 7:1, 8:11
**PICK** [2] - 39:18, 48:6
**PICKED** [1] - 31:1
**PICKING** [1] - 7:2
**PIECE** [1] - 57:4
**PIECES** [2] - 27:18, 74:12
**PLACE** [5] - 15:20, 15:22, 15:23, 29:20
**PLACES** [1] - 12:17
**PLAINTIFF** [14] - 39:3, 61:25, 62:3, 66:21, 67:12, 67:18, 67:22, 68:2, 68:5, 69:4, 69:16, 70:6, 72:12, 72:17
**PLAINTIFF** [2] - 1:15, 9:2
**PLAINTIFF'S** [2] - 21:25, 66:24
**PLAINTIFFS** [12] - 2:7, 9:8, 56:24, 60:15, 60:17, 62:5, 68:8, 70:2, 71:5, 71:15, 71:22, 72:5
**PLAINTIFFS** [1] - 1:4
**PLAINTIFFS'** [7] - 70:22, 71:13, 71:19, 73:22, 73:23, 74:3, 74:6
**PLAUSIBLY** [1] - 67:19
**PLAY** [1] - 68:16
**PLEASED** [1] - 68:17
**PODIUM** [1] - 36:7
**POINT** [9] - 26:13, 28:3, 30:13, 34:7, 43:11, 49:10, 54:6, 60:9, 70:4
**POINTS** [1] - 73:2
**POLICIES** [1] - 22:2
**PORTION** [1] - 14:12

**POSITION** [1] - 65:10
**POST** [2] - 56:17, 63:24
**POST-TRIAL** [2] - 56:17, 63:24
**POTENTIAL** [2] - 46:22, 46:23
**PRACTICE** [1] - 63:21
**PRACTICES** [1] - 22:2
**PRECISE** [1] - 71:8
**PRECISELY** [1] - 71:9
**PRECISION** [1] - 70:23
**PREFER** [1] - 9:20
**PREFERRED** [1] - 46:13
**PREJUDGMENT** [11] - 64:22, 64:23, 65:1, 65:3, 65:7, 65:10, 69:21, 69:22, 73:18, 74:15, 74:24
**PREJUDICE** [5] - 62:9, 62:14, 62:17, 68:15, 68:19
**PRESENT** [6] - 14:6, 14:16, 21:4, 21:6, 52:5, 54:9
**PRESUMPTION** [1] - 70:20
**PRETRIAL** [1] - 13:25
**PRETTY** [4] - 33:18, 33:19, 35:23, 57:4
**PREVENTED** [2] - 62:1, 68:3
**PRIMARILY** [1] - 18:5
**PRISON** [2] - 23:17, 28:8
**PRO** [1] - 1:19
**PROBLEM** [5] - 34:13, 35:1, 42:20, 46:6, 70:13
**PROBLEMS** [1] - 71:12
**PROCEED** [6] - 3:3, 7:3, 9:12, 10:22, 32:3, 39:7
**PROCEEDINGS** [1] - 76:4
**PROCEEDINGS** [1] - 1:25
**PROCESS** [1] - 22:12
**PRODUCED** [1] - 1:25
**PROOF** [1] - 63:16
**PROPERLY** [3] - 69:10, 70:3, 73:2
**PROTECTING** [1] - 49:2
**PROVEN** [2] - 56:23, 56:25
**PROVES** [1] - 69:12
**PROVIDE** [1] - 20:2
**PROVIDED** [5] - 43:20, 62:10, 62:11, 67:21, 69:1
**PROVIDES** [3] - 65:8, 69:19
**PROVISION** [1] - 68:12
**PUBLISH** [1] - 58:24
**PULL** [1] - 64:14
**PURCHASED** [1] - 10:14
**PURPOSES** [4] - 14:9, 17:5, 21:23, 73:13
**PURSUE** [1] - 73:23
**PUT** [3] - 42:6, 60:25, 61:3

**Q**

**QUARTER** [1] - 57:20
**QUESTION** [4] - 16:15, 16:20, 17:21, 17:23
**QUESTIONING** [1] - 14:10
**QUESTIONS** [31] - 4:11, 4:14, 9:8, 27:5, 27:9, 31:3, 32:3, 35:2, 36:7, 36:12, 37:4, 37:5, 38:12, 38:13, 39:8, 43:14, 43:16, 44:5, 44:8, 44:16, 44:23, 45:10, 46:14, 47:6, 48:9, 48:11, 55:25, 56:22, 61:12, 64:18, 71:3
**QUICK** [1] - 38:20
**QUITE** [3] - 4:21, 20:16, 68:7
**QUOTE** [3] - 62:1, 67:25, 68:6

**R**

**RAISE** [1] - 8:23
**RAISES** [1] - 70:23
**RARE** [2] - 29:14, 30:22
**RATE** [11] - 29:11, 30:6, 30:12, 37:8, 43:1, 68:25, 69:1, 70:7, 71:14, 71:19, 72:7
**RATES** [4] - 30:17, 30:18, 30:24, 43:5
**RATHER** [1] - 61:5
**RE** [1] - 68:19
**RE-FILING** [1] - 68:19
**REACH** [2] - 62:13, 65:13
**READ** [6] - 16:14, 21:16, 21:18, 25:2, 66:4, 68:1
**READING** [1] - 66:14
**READY** [2] - 21:21, 21:22
**REALLY** [8] - 8:4, 13:18, 28:13, 50:6, 53:23, 54:2, 55:21, 57:1
**REASON** [3] - 20:24, 33:18, 37:12
**REASONABLE** [2] - 65:7, 71:4
**REASONED** [1] - 71:10
**RECEIVE** [5] - 34:10, 34:17, 34:22, 34:25, 44:1
**RECEIVED** [2] - 43:24, 51:23
**RECEIVING** [1] - 61:20
**RECENTLY** [1] - 11:24
**RECESS** [3] - 31:14, 38:22, 58:1
**RECOGNIZE** [2] - 13:2, 32:8
**RECORD** [15] - 2:6, 16:9, 20:23, 20:24, 27:10, 31:25, 46:12, 46:18, 51:20, 53:10,

53:12, 66:4, 68:22, 76:4
**RECORDED** [1] - 1:25
**RECORDS** [13] - 20:13, 20:19, 20:22, 21:25, 22:1, 22:3, 28:22, 28:25, 51:22, 57:5, 60:10, 62:11, 70:19
**RECOVER** [1] - 65:6
**RECOVERED** [1] - 69:16
**RECOVERY** [1] - 69:9
**REFERENCE** [1] - 15:18
**REFUSING** [1] - 65:22
**REFUTE** [2] - 22:20, 23:4
**REFUTED** [1] - 60:15
**REGARD** [6] - 10:20, 63:16, 63:18, 69:22, 74:9, 74:10
**REGARDING** [4] - 20:20, 23:5, 60:17, 67:9
**REGARDLESS** [2] - 26:22, 26:23
**REGISTERED** [1] - 50:8
**REGULAR** [1] - 68:25
**REILLY** [1] - 69:24
**REITERATE** [1] - 38:6
**RELEVANT** [1] - 61:11
**REMAIN** [1] - 57:24
**REMAINED** [2] - 39:22, 41:17
**REMEMBER** [12] - 20:16, 29:1, 29:7, 44:12, 44:14, 47:9, 47:12, 47:15, 48:3, 48:4, 50:5, 50:7
**REMIND** [1] - 58:8
**RENDERED** [1] - 75:18
**RENT** [4] - 36:22, 37:21, 38:2, 42:25
**REPEAT** [3] - 15:17, 22:9, 33:24
**REPEATED** [1] - 17:25
**REPETITION** [1] - 15:1
**REPORT** [2] - 40:7, 60:21
**REPORTER** [1] - 76:1
**REPORTER** [1] - 36:13
**REPORTER** [3] - 1:22, 1:23, 76:8
**REPORTING** [1] - 63:21
**REPRESENT** [1] - 2:18
**REPRESENTING** [1] - 2:13
**REQUEST** [1] - 31:10
**REQUESTED** [1] - 15:2
**REQUESTS** [1] - 14:25
**REQUIRES** [2] - 68:24, 73:15
**RESIDENCE** [2] - 10:4, 12:20
**RESORT** [1] - 63:8
**RESPONSIBLE** [2] - 18:5, 18:14
**REST** [3] - 35:25, 36:4, 37:13
**RETURN** [1] - 61:11
**REVISE** [2] - 64:8, 64:10
**RMR** [2] - 1:22, 76:8
**ROLE** [1] - 7:7

**ROOFING** [2] - 11:25, 12:12
**ROOFING** [1] - 12:10
**ROUGHLY** [1] - 28:23
**ROUND** [1] - 39:24
**RULE** [1] - 46:20
**RULES** [1] - 61:23

**S**

**SAKE** [2] - 58:11, 58:12
**SALARY** [1] - 28:14
**SALVADOR** [2] - 27:23, 28:9
**SATURDAY** [2] - 51:10, 51:12
**SATURDAYS** [2] - 51:16, 51:19
**SAVE** [1] - 22:10
**SAVINGS** [1] - 59:21
**SAW** [1] - 55:9
**SCHEDULE** [1] - 37:11
**SCHOOL** [10] - 23:3, 45:19, 47:10, 49:10, 49:11, 50:13, 51:6, 51:9, 54:16
**SE** [1] - 1:19
**SEARCHED** [2] - 22:1, 22:2
**SEASON** [15] - 33:4, 33:6, 33:7, 33:11, 35:14, 71:2, 71:17, 72:1, 72:3, 72:6, 72:11, 72:12, 72:22, 73:12, 73:14
**SEASONS** [1] - 72:21
**SEAT** [2] - 9:5, 39:7
**SEATED** [1] - 13:2
**SECOND** [8] - 10:7, 10:9, 10:11, 10:13, 35:4, 43:19, 66:18, 75:15
**SECOND** [4] - 61:21, 67:11, 69:7, 69:25
**SECTION** [3] - 67:24, 69:2, 69:17
**SEE** [15] - 11:21, 14:4, 14:21, 16:5, 26:17, 28:6, 37:3, 46:25, 52:15, 53:10, 53:13, 57:14, 75:24
**SEEK** [3] - 67:23, 74:14, 74:17
**SEND** [2] - 7:2, 75:17
**SENSE** [2] - 57:13, 68:20
**SENT** [1] - 28:9
**SENTENCE** [1] - 66:13
**SEPARATE** [1] - 73:24
**SEPARATELY** [1] - 69:20
**SEPTEMBER** [2] - 49:9, 59:17
**SERIOUS** [1] - 60:24
**SERVE** [2] - 74:7
**SERVICE** [10] - 2:3, 10:25, 11:7, 13:17, 13:22, 32:12, 32:13, 39:12, 58:23, 59:19

**SERVICE** [1] - 1:8
**SERVICE** [1] - 37:2
**SESSION** [1] - 58:2
**SET** [4] - 3:24, 5:2, 7:15, 38:2
**SETS** [1] - 59:17
**SETTING** [1] - 5:4
**SETTLE** [2] - 74:7, 74:13
**SEVEN** [1] - 33:14
**SEVERAL** [1] - 66:20
**SHALL** [1] - 65:5
**SHEETS** [1] - 21:25
**SHOP** [1] - 61:6
**SHORTER** [1] - 72:3, 73:10
**SHOW** [8] - 14:12, 21:12, 51:25, 61:25, 67:12, 67:18, 68:2, 73:5
**SHOWED** [1] - 34:18
**SHOWING** [4] - 14:19, 63:16, 66:25, 68:11
**SIDES** [1] - 71:12
**SIMPLE** [2] - 10:20, 18:22
**SIMPLY** [4] - 62:10, 62:25, 68:18, 74:10
**SINGLE** [3] - 35:12, 41:21, 60:24
**SIT** [1] - 32:2
**SITTING** [1] - 2:20
**SITUATION** [1] - 71:9
**SIX** [5] - 30:20, 36:2, 40:24, 71:1
**SIZE** [1] - 58:13
**SKILLS** [1] - 4:21
**SLOW** [2] - 35:23, 40:2
**SLOWED** [1] - 35:14
**SMOKING** [1] - 26:17
**SNOW** [1] - 35:17
**SOMEONE** [2] - 2:20, 28:10
**SOMETIMES** [14] - 16:16, 20:5, 24:2, 29:13, 30:8, 30:9, 37:7, 40:9, 40:18, 41:2, 47:13, 48:6, 52:13, 54:15
**SOMEWHERE** [1] - 25:14
**SON** [4] - 7:6, 23:1, 45:12, 60:12
**SOON** [1] - 75:24
**SORRY** [6] - 11:2, 15:21, 21:14, 56:10, 59:13, 66:11
**SORT** [2] - 5:19, 71:7
**SPANISH** [6] - 9:15, 9:20, 27:17, 36:12, 46:15
**SPEAKING** [2] - 48:16
**SPECIFIC** [2] - 52:7, 55:1
**SPECIFICALLY** [1] - 39:17
**SPELL** [3] - 31:24, 46:11, 47:3
**SPREAD** [2] - 47:19, 66:22
**SPRING** [1] - 42:4
**SQUARE** [1] - 62:8

**STAFFS** [1] - 7:14
**STAND** [9] - 5:9, 8:19, 8:21, 8:22, 31:7, 38:18, 45:8, 45:13, 56:7
**STANDARD** [2] - 53:15, 73:2
**STANDARDS** [1] - 69:2
**STANDBY** [4] - 4:13, 4:16, 7:5, 9:18
**STANDING** [5] - 61:25, 62:4, 62:15, 67:23, 68:5
**STANDS** [1] - 60:17
**START** [7] - 11:22, 26:2, 39:20, 41:14, 41:18, 49:23, 70:14
**STARTED** [14] - 7:16, 8:8, 11:23, 27:23, 28:6, 33:6, 33:25, 39:21, 41:15, 41:20, 42:2, 42:7, 42:8, 70:11
**STATE** [2] - 62:25
**STATE** [13] - 2:5, 2:11, 12:6, 31:24, 46:11, 46:19, 60:19, 61:7, 62:19, 68:16, 68:19, 69:4, 73:4
**STATEMENT** [9] - 3:4, 3:6, 34:17, 43:23, 44:1, 62:11, 67:6, 67:10, 70:9
**STATEMENTS** [4] - 57:6, 61:21, 62:12, 68:12
**STATES** [2] - 1:1, 1:13
**STATES** [1] - 12:17
**STATES** [1] - 1:5
**STATUTE** [1] - 65:2
**STATUTORY** [1] - 67:23
**STAY** [3] - 10:15, 27:6, 64:25
**STAYED** [1] - 41:21
**STENOGRAPHY** [1] - 1:25
**STEP** [6] - 31:5, 36:7, 38:16, 38:21, 45:7, 56:4
**STEVEN** [1] - 1:17
**STEVEN** [1] - 2:7
**STILL** [8] - 11:23, 19:12, 25:10, 38:2, 55:14, 59:24, 63:7, 74:2
**STIPULATE** [1] - 63:8
**STONES** [1] - 28:3
**STOP** [11] - 25:13, 25:17, 26:18, 28:11, 35:4, 41:5, 41:9, 41:10, 43:11, 51:3, 54:3
**STOPPED** [7] - 25:24, 26:15, 28:3, 28:4, 28:15, 36:19, 50:18
**STRAIGHTFORWARD** [1] - 73:10
**STREET** [4] - 1:16, 1:19, 10:3, 22:2
**STRUCK** [1] - 63:4
**STUDENT** [1] - 51:3
**SUBJECT** [1] - 66:25
**SUBMIT** [2] - 74:21, 75:5

**SUBMITTED** [2] - 64:12, 73:21
**SUFFICIENT** [2] - 62:14, 67:23
**SUFFICIENTLY** [1] - 69:5
**SUGGEST** [3] - 63:3, 74:13, 74:25
**SUGGESTED** [2] - 61:22, 71:11
**SUMMARY** [1] - 62:18
**SUMMER** [9] - 23:2, 47:9, 49:7, 49:8, 51:5, 51:6, 54:10, 54:14, 72:2
**SUN** [4] - 55:14, 57:11, 59:4, 59:17
**SUNDAY** [2] - 51:10, 51:12
**SUNSET** [6] - 58:22, 58:24, 59:1, 59:9, 59:19
**SUNY** [6] - 49:14, 49:15, 50:2, 50:15, 50:19, 51:3
**SUPERVISE** [1] - 32:21
**SUPERVISING** [1] - 18:5
**SUPPORT** [2] - 64:12
**SUPPOSED** [4] - 33:13, 34:14, 40:7, 40:12
**SURPRISE** [1] - 48:24
**SUSTAINED** [1] - 20:11
**SWORN** [7] - 8:12, 8:21, 9:3, 31:23, 39:5, 46:7, 46:9
**SYSTEM** [1] - 3:16
**SYSTEMS** [1] - 69:8

**T**

**T-O-M-A-R** [1] - 8:16
**TABLE** [1] - 2:21
**TECHNICAL** [1] - 50:23
**TELEPHONE** [1] - 1:23
**TELEPHONES** [1] - 5:14
**TELEPHONICALLY** [1] - 1:21
**TELEVISION** [1] - 37:25
**TEN** [4] - 31:11, 64:9, 72:6, 72:8
**TEN-HOUR** [1] - 72:6
**TERMS** [3] - 60:5, 62:21, 72:12
**TERRIBLE** [1] - 28:16
**TESTIFIED** [10] - 9:3, 12:19, 30:16, 31:23, 39:6, 46:10, 48:19, 54:9, 62:5, 68:8
**TESTIFY** [3] - 8:21, 30:23, 46:25
**TESTIFYING** [3] - 9:17, 49:1, 57:10
**TESTIMONY** [11] - 15:6, 22:19, 22:20, 23:5, 27:11, 48:18, 60:15, 60:16, 70:22, 70:24

9

**THE** [246] - 1:12, 2:9, 2:11, 2:13, 2:16, 2:20, 2:24, 3:3, 3:7, 3:15, 3:18, 3:21, 3:24, 4:2, 4:5, 4:9, 4:17, 4:20, 4:23, 5:1, 5:4, 5:8, 5:13, 5:18, 5:23, 6:1, 6:3, 6:6, 6:9, 6:21, 6:23, 7:4, 7:9, 7:11, 7:13, 7:18, 7:21, 8:1, 8:3, 8:4, 8:6, 8:7, 8:13, 8:14, 8:15, 8:17, 8:20, 9:5, 9:6, 9:7, 9:11, 9:12, 9:21, 10:1, 10:16, 10:18, 10:22, 11:2, 12:21, 14:5, 14:7, 14:12, 14:22, 14:23, 14:25, 15:2, 15:4, 15:11, 15:13, 15:19, 15:22, 16:5, 16:7, 16:11, 20:11, 21:5, 21:7, 21:12, 21:16, 21:21, 21:23, 22:6, 22:8, 22:13, 22:16, 24:25, 25:2, 25:5, 25:6, 25:7, 25:8, 26:18, 27:1, 27:6, 27:16, 27:18, 27:20, 28:11, 29:2, 29:5, 29:7, 29:10, 29:13, 29:15, 29:19, 29:22, 30:1, 30:4, 31:1, 31:5, 31:11, 31:15, 31:17, 31:18, 31:24, 32:1, 32:2, 34:5, 35:4, 35:6, 35:8, 35:11, 35:15, 35:17, 35:18, 35:20, 35:25, 36:2, 36:5, 36:11, 37:4, 37:9, 37:14, 37:17, 37:18, 37:19, 37:20, 37:22, 37:24, 38:3, 38:11, 38:14, 38:16, 38:19, 39:2, 39:7, 40:16, 40:18, 40:19, 40:20, 40:22, 40:23, 40:25, 41:2, 41:9, 41:11, 41:13, 41:15, 41:18, 41:20, 41:23, 42:2, 42:4, 42:5, 42:6, 42:10, 42:11, 42:12, 42:13, 43:3, 43:8, 43:15, 43:19, 44:6, 44:16, 44:24, 45:3, 45:4, 45:7, 45:9, 45:11, 45:16, 45:20, 45:24, 46:4, 46:11, 46:13, 46:24, 47:1, 47:3, 47:4, 47:5, 48:10, 49:21, 52:21, 52:22, 56:1, 56:3, 56:5, 56:6, 56:8, 56:10, 56:13, 56:15, 56:18, 56:22, 57:15, 57:23, 58:4, 58:7, 58:9, 58:11, 58:18, 59:3, 59:8, 59:11, 59:14, 60:7, 61:10, 61:14, 61:16, 61:18, 62:20, 63:10, 63:13, 64:3, 64:5, 64:7, 64:10, 64:18, 64:21, 64:25, 65:12, 65:16, 65:21, 65:25, 66:3, 66:11, 66:14, 74:12, 74:19, 74:23, 75:5, 75:9, 75:12, 75:23
**THEMSELVES** [1] - 67:17

**THEREBY** [1] - 72:5
**THEREFORE** [1] - 73:6
**THEREIN** [1] - 70:25
**THEREOF** [1] - 66:9
**THEY'VE** [1] - 56:23
**THINKS** [1] - 56:23
**THOUGHTS** [1] - 56:24
**THOUSAND** [1] - 37:1
**THREE** [7] - 10:12, 11:16, 19:14, 40:20, 41:2, 49:17, 63:25
**THRESHOLD** [2] - 62:24, 63:6
**THROUGHOUT** [3] - 2:18, 33:22, 54:24
**THROWING** [1] - 28:2
**TIED** [1] - 28:1
**TIL** [1] - 49:9
**TIMELY** [2] - 62:3, 68:4
**TIP** [2] - 47:18, 53:1
**TIPS** [1] - 47:19
**TODAY** [14] - 10:15, 11:18, 11:20, 28:17, 46:23, 48:15, 60:14, 66:7, 74:11, 74:14, 75:10, 75:14, 75:24
**TOGETHER** [1] - 52:20
**TOMAR** [2] - 1:21, 8:16
**TOP** [2] - 48:20, 55:5
**TOTAL** [6] - 35:5, 64:16, 69:15, 72:11, 72:22, 73:16
**TRACKING** [1] - 63:22
**TRADITIONAL** [1] - 71:14
**TRANSCRIPT** [3] - 14:19, 17:15, 76:4
**TRANSCRIPT** [1] - 1:12
**TRANSCRIPT** [1] - 1:25
**TRANSCRIPTION** [1] - 1:25
**TRANSLATE** [6] - 10:18, 27:19, 28:19, 37:5, 41:24, 59:12
**TRANSLATED** [2] - 5:10, 5:11
**TRANSLATES** [2] - 10:2, 11:3
**TRANSLATING** [1] - 59:15
**TRANSLATIONS** [1] - 66:6
**TRANSLATOR** [1] - 28:18
**TRANSUNION** [1] - 61:22
**TRAVEL** [1] - 59:24
**TREE** [3] - 28:1, 32:15, 57:16
**TREE** [1] - 1:7
**TREE** [8] - 2:3, 10:25, 11:7, 13:17, 13:22, 32:12, 32:13, 39:12
**TREES** [9] - 32:14, 32:18, 35:15, 35:17, 35:23, 39:15, 40:5, 55:5, 57:12
**TRIAL** [6] - 14:1, 17:6, 56:17, 62:10, 63:24, 66:7

**TRIAL** [1] - 1:12
**TRICKY** [1] - 4:5
**TRIED** [3] - 22:10, 25:23, 37:2
**TRIMMING** [3] - 32:14, 35:15, 39:15
**TRUCK** [9] - 26:1, 26:2, 26:3, 26:5, 26:7, 26:11, 26:16, 34:8, 59:25
**TRUE** [7] - 12:10, 12:12, 15:9, 37:7, 37:16, 37:20, 70:9
**TRUTH** [3] - 15:10, 44:20, 49:3
**TRUTHFUL** [4] - 10:20, 12:20, 16:23, 22:15
**TRY** [5] - 7:14, 7:16, 36:8, 46:16, 66:15
**TRYING** [5] - 5:25, 11:21
**TRYING** [1] - 7:19
**TV** [1] - 38:2
**TWICE** [1] - 20:5
**TWO** [25] - 11:16, 12:17, 13:2, 14:2, 19:14, 22:25, 23:9, 39:22, 40:21, 41:3, 41:7, 41:8, 41:17, 44:21, 47:12, 48:9, 49:17, 57:20, 58:21, 58:25, 63:25, 71:1, 72:15, 72:24, 74:12
**TYPE** [2] - 11:17, 30:21

**U**

**UNCLEAR** [1] - 73:19
**UNCOMPENSATED** [3] - 69:6, 72:9, 72:10
**UNDER** [13] - 9:9, 46:5, 62:24, 66:8, 66:17, 66:24, 67:5, 67:6, 67:24, 69:4, 69:11, 69:22, 73:4
**UNDERPAID** [1] - 62:6
**UNDERPAYMENT** [2] - 65:6, 69:13
**UNDERSTOOD** [2] - 56:21, 75:8
**UNDERTAKEN** [1] - 67:19
**UNFAIRLY** [1] - 68:9
**UNFORTUNATELY** [1] - 23:16
**UNITED** [2] - 1:1, 1:13
**UNITED** [1] - 1:5
**UNLESS** [4] - 7:6, 65:8, 67:18, 69:12
**UNLOAD** [1] - 59:25
**UNPAID** [1] - 67:4
**UNQUOTE** [1] - 62:3
**UP** [29] - 3:24, 5:2, 5:4, 7:1, 7:2, 7:7, 7:15, 8:20, 11:24, 12:6, 21:19, 24:3, 28:1,

28:3, 28:24, 29:22, 31:1, 38:14, 39:16, 39:18, 39:19, 46:4, 46:7, 48:7, 55:14, 61:6, 64:14, 71:10, 72:19
**URGENTLY** [1] - 30:22
**USER** [1] - 26:24

**V**

**VARIED** [1] - 72:1
**VARIOUS** [1] - 22:2
**VEHICLES** [1] - 26:25
**VERSUS** [3] - 2:3, 69:8, 69:24
**VIEW** [2] - 65:4, 68:9
**VIOLATES** [1] - 61:4
**VIOLATIONS** [1] - 67:5

**W**

**WAGE** [13] - 43:5, 57:6, 61:21, 62:10, 62:12, 66:22, 67:6, 67:10, 68:12, 68:25
**WAGES** [14] - 22:3, 23:6, 34:18, 44:2, 48:22, 54:11, 60:16, 62:2, 63:22, 68:4, 69:13, 69:15, 70:6
**WAIT** [14] - 7:11, 8:10, 14:23, 22:16, 26:18, 30:1, 35:4, 40:16, 49:21
**WAKE** [1] - 61:22
**WANTS** [2] - 5:9, 45:25
**WEATHER** [2] - 58:23, 59:19
**WEBSITE** [1] - 12:4
**WEDNESDAY** [2] - 74:22, 75:6
**WEEK** [27] - 11:16, 13:14, 13:20, 16:25, 18:2, 20:5, 35:22, 36:1, 36:4, 40:4, 40:21, 41:3, 41:19, 42:1, 42:7, 49:17, 51:8, 54:16, 71:1, 71:17, 71:20, 72:9, 72:10, 72:15
**WEEKEND** [2] - 49:16, 51:6
**WEEKENDS** [1] - 51:9
**WEEKS** [4] - 16:19, 22:22, 28:8, 72:23
**WHATSOEVER** [2] - 20:19, 60:10
**WHOLE** [2] - 29:12, 29:17
**WILLFULNESS** [3] - 63:18, 63:23, 73:3
**WILLIAM** [2] - 2:12
**WILLIAM** [4] - 1:8, 1:19, 9:1, 77:3
**WING** [1] - 66:15
**WINTER** [1] - 40:5
**WISHES** [2] - 73:23, 74:3

**WITHDRAW** [2] - 42:17, 61:1
**WITHDRAWN** [1] - 51:2
**WITNESS** [35] - 3:9, 8:9, 8:20, 8:22, 10:19, 14:16, 21:4, 21:6, 23:2, 24:24, 27:5, 31:4, 31:7, 31:8, 31:19, 31:22, 35:3, 38:18, 39:2, 39:5, 45:8, 45:9, 45:11, 45:16, 45:25, 46:1, 46:2, 46:9, 46:19, 46:22, 46:23, 56:7, 60:11
**WITNESS** [3] - 31:7, 38:18, 45:8
**WITNESS** [39] - 9:6, 9:11, 11:2, 14:22, 16:7, 25:5, 25:7, 27:16, 27:20, 29:2, 29:7, 29:13, 29:19, 32:1, 35:6, 35:11, 35:17, 35:20, 36:2, 37:9, 37:17, 37:19, 37:24, 40:18, 40:20, 40:23, 41:2, 41:11, 41:15, 41:20, 42:2, 42:5, 42:10, 42:12, 45:3, 47:4, 52:22, 56:5, 77:1
**WITNESS'S** [1] - 47:2
**WITNESSES** [4] - 56:8, 56:11, 56:13, 56:16
**WORD** [1] - 7:18
**WORDS** [1] - 68:8
**WORKDAY** [7] - 18:20, 22:24, 24:5, 24:10, 24:14, 29:6, 70:11
**WORKER** [1] - 55:24
**WORKERS** [3] - 47:17, 48:22, 49:2
**WORKS** [1] - 11:22
**WORKWEEK** [1] - 69:6
**WORRY** [1] - 10:1
**WRITE** [1] - 20:9
**WRITING** [2] - 34:20, 75:21
**WRITTEN** [1] - 75:16

**Y**

**YARD** [3] - 59:24, 60:1, 70:12
**YEAR** [14] - 35:10, 35:24, 35:25, 39:24, 42:3, 43:12, 49:6, 51:4, 59:10, 72:13, 72:23, 72:25
**YEARS** [14] - 10:6, 10:12, 12:13, 35:5, 35:6, 39:22, 41:7, 41:8, 41:17, 51:18, 60:19, 62:13, 72:21, 72:22
**YORK** [1] - 1:1
**YORK** [20] - 1:5, 1:16, 1:20, 9:24, 10:3, 60:20, 62:25, 63:7, 63:9, 63:15, 66:8, 66:18, 67:5, 67:7, 68:22, 68:23, 69:2, 69:9, 69:17,

73:15
**YOURSELF** [5] - 2:13, 2:18, 9:9, 47:13, 48:4

**Z**

**ZOOM** [2] - 6:9, 6:12